## Ex Parte R. H. Jones.

### *No. 41. Decided January 11.*

**1. Habeas Corpus—Bail—Proof Evident, Rules as to.—**On a habeas corpus application for bail, after indictment for murder, the following rules appear to be well settled:

1. It devolves upon the applicant to show that the proof is not evident, and that he is entitled to bail.

2. Bail should be refused if the proof is evident.

3. Proof may be evident, though there may be conflicting evidence.

4. Proof is evident if the evidence adduced would sustain a verdict for murder of the first degree.

5. Proof is evident if, upon consideration of the evidence adduced, the court should conclude that the accused should be convicted of murder of the first degree if the law is administered.

**2. Same—Bail, when Authorized.—**To authorize a granting of bail on an application by habeas corpus, where applicant is charged with murder and the fact of the killing is not controverted, it devolves upon applicant to show:

1. That when the intention to kill was formed, his mind was not calm and sedate, and in condition to comprehend the nature of the act and its probable consequences.

2. That it was not in such condition when he killed deceased.

**3. Manslaughter—Construction of Statutes—Insulting Conduct Toward Female Relative.—**Subdivision 4 of article 597, Penal Code, provides, that insulting words or conduct of the person killed toward a female relative of the person guilty of the homicide, is such adequate cause as will reduce the offense to manslaughter. And article 601 of the Penal Code provides, that any female under the permanent or temporary protection of the accused at the time of the killing, shall also be included within the meaning of the term "relation." *Held*, in construing these two articles together, that the insult must be given to the female while under the protection of the slayer, and the killing must also be done while she is under his protection.

**4. Female Relationship, Actual and Statutory—Difference in, as to Insults.—**The difference between the cases of an actual relation and the statutory relationship of protection is, that while in both cases the insult must be given while the relationship exists, the killing must occur at the first meeting in the case of the actual relationship, and in the statutory relationship it must occur during the existence of the relationship; for if the female so insulted leaves the protection of the slayer before the first meeting with the one insulting her occurs, the right to act is gone.

**5. Statutory Limitations.—**Where a statute limits the persons or classes upon which it is operative, or limits the time within which any act can be done,

it is not within the power of the court, by judicial legislation, to extend the limitation either as to persons, classes, or as to time.

6. **Manslaughter—"Sudden Passion."**— Our code characterizes the passion that reduces the homicide to manslaughter as "sudden passion," and no time is allowed, except in cases mentioned in article 597, for brooding over the wrong, or for compassing and preparation, and even in this latter class of cases it must appear that the homicide was the result of a passion that rendered the slayer incapable of cool reflection, and in the absence of such passion the adequate cause may become cogent evidence of malice, and an aggravating circumstance attending the commission of the offense. Following Breedlove's case, 26 Texas Court of Appeals, 453; Massie's case, 30 Texas Court of Appeals, 69.

7. **Murder in Second Degree—"Sudden Passion."**—Under our code a homicide committed in "sudden passion," and without adequate cause, is murder in the second degree. But it must be the passion that strikes. The law makes no allowance for the passion of revenge.

8. **Murder in First Degree—Express Malice.**—Even in cases attendant with grave palliating circumstances, if the evidence renders it certain that the mind of the defendant was in fact calm and deliberate when the design to kill was formed, or that when it was executed it was done in pursuance of a formed design, as manifested by threats to take life, by the purchase and exhibition of weapons purchased and procured for that purpose, said purpose to be consummated whenever the parties should meet, and at the time of the killing there was no excitement other than that naturally attending such an act, but the same is committed calmly, coolly, or covertly, it is murder upon express malice and murder of the first degree.

9. **Fact Case.**—See the statement of facts for a case in which it was held that the applicant was not entitled to bail.

Hurt, P. J., whilst concurring in the conclusions reached, does not concur in all the propositions above stated.

APPEAL from the District Court of Dallas. Tried below before Hon. CHARLES FRED TUCKER.

Appellant was indicted by the grand jury of Dallas County, on the 4th day of November, 1892, for the murder of one W. G. Veal, in Dallas County, Texas, on the 25th day of October, 1892, by shooting him with a pistol.

On the 9th day of November, 1892, he applied for a writ of habeas corpus for bail, which was granted by the Hon. Charles Fred Tucker; and the cause having come on for trial on the 21st day of November, 1892, before said district judge, applicant was refused bail, and remanded to the custody of the sheriff of Dallas County. From this order and judgment, refusing him bail, he prosecutes this his appeal.

No briefs have come into the hands of the Reporter.

Owing to the great interest this case has excited throughout the State, we reproduce below the statement of the facts found in the record, only omitting minor unimportant incidents and details.

The State introduced in evidence the capias and indictment which were made a part of the sheriff's return.

J. F. Van Horn, for applicant, testified: 'I was acquainted with W. G. Veal in his lifetime. Was present at the time of his death. He died at Sterling Price headquarters, in the city of Dallas, Dallas County. He was killed by Dr. R. H. Jones. At the time of the killing I was sitting in the front room of the Sterling Price headquarters, talking to Mr. Mendez. All at once I heard a pistol go off, immediately after an anvil was fired. I thought some one was firing out of the window. Immediately after I heard some .one say that Veal was killed. Some one said that Jones had killed Veal. Just as soon as I heard this, I went out of the room, and met Dr. Jones coming out of the other room. I said, "Jones, what in the hell have you done?" He said, "I have killed Veal. He raped my wife." Mr. Worthy and I were together, and Jones handed Worthy his pistol.

Mrs. Sarah Jones, for applicant, testified: My name is Sarah Jones— Mrs. R. H. Jones. My maiden name was Sarah F. Smith. My father's name was James N. Smith. I have lived in Dallas since I was very small; ever since I was about 2½ years old. I was married before I married Dr. Jones. My first husband was James H. Bullington. During my first marriage, I lived part of the time in New Orleans, and part in Arkansas. My first husband died in October, 1870. We had one child, a son, born in August, 1870. I married Dr. Jones in March, 1874.

I was acquainted with Mr. Veal a short time in the spring of 1872. I had then been a widow about eighteen months, or a little longer. I met Mr. Veal at Mrs. Sarah H. Cockrell's, where I boarded. Mr. Veal did outrage me. I do not remember the exact date of the occurrence. I am not sure whether it was in April or May, 1872. I was at Mrs. Cockrell's. It was Mrs. Sarah Cockrell, mother of Frank and Alex. Cockrell. I had been living there at least a year during my widowhood. I met Captain Veal at Mrs. Cockrell's, where I lived. Mrs. Cockrell seemed to think a great deal of him, and invited me in the parlor to see him. She said she wanted me to see Parson Veal, and entertain him while she went out and got supper. He was pleasant and entertaining, and expressed a great deal of sympathy for me. He said he would aid me in any way he could. I thought he was one of my best friends. He was there to spend the night. I had never heard anything against him then. I knew he was a minister, and thought him a good man. He told me of the orphans he had educated and cared for, and of the widows he had befriended. He said I must look upon him as a father. He showed a special interest in me, and said he was specially interested in me, as I was the widow of a brother Mason. He asked me to show him my papers and deeds, to see if they were all right; to see if he could aid me in any way. I did so, thinking he was my friend. I trusted him as if he had been my father.

I thought him only truthful and sincere in what he said.  I met him several times that spring.  He came to see Mrs. Cockrell, but I never went in the parlor unless invited by Mrs. Cockrell.  I had confidence in everybody then.  I was young—had never been deceived, and thought every one was good.  I thought he, especially, being a minister, and a man that could kneel every night and morning and ask God to protect the widows and orphans, surely must be a good man.  He never did anything from which you might suppose that he was anything but all right.

When I awoke one night and found him at my bedside I was speechless.  I know I raised up my hands and said, "Oh, go away."  I was so frightened that I hardly knew what I was doing.  I cried out as loud as I could, "Oh, go away."  I think he said, "Hush; they will hear you."  Finally I threw my arms around my sleeping baby and clung to him until Mr. Veal tore me away from the baby, and accomplished his purpose.  I was frightened and helpless.  I could do nothing to help myself.  I was perfectly helpless and could not think or act.  After I had recovered myself a little, and realized that I had been outraged, and by that man, I thought I would go crazy.  I thought I could not live.  My first impulse was to throw myself into the river.  But I knew my helpless child was there, and I could not do it on that account.  My child had been in bad health, and I had had a physician with him nearly all spring.  After I was outraged and recovered myself a little, so I could think, I was almost crazy with grief.  I thought I was ruined and disgraced forever.  My first impulse was to kill myself, but I could not do that, so I thought I would go downstairs and tell Mrs. Cockrell.  She was an old friend of mine, so I thought I would tell her about it.  I went downstairs next morning and found Parson Veal sitting in the room, ready to hold family prayers.  When I saw this my heart sank.  I thought nobody would believe me if I told it.  He knelt down that morning and prayed for the widows and orphans, and thanked God for taking care of that household during the night.

I went upstairs and wrote him a letter, asking him how he dared to make such a prayer after what he had done?  I knew if I told it I would be prosecuting a man, and I could not bear to do it.  I could not bear to be talked about.  I could not bear the thought of having to go to the court house.  I knew he would not hesitate to tell falsehoods about me, although he was thought to be a good man and a minister.  I had always had a horror of the court room.

Soon after this happened I went to Kentucky.  I was getting ready to go then.  I went to Kentucky and stayed with my aunt and relatives there.  I came back here in 1873.  Met my husband in the fall, and married him in the spring.  I felt at the time that I ought to tell him about it, but I dreaded to do it, as I had known him but a short time.  I thought of myself, and thought I would tell him, but thought he would

not believe me, and would think I ought to have done something to have prevented it. I thought that if he did believe me he might get killed. I knew I could not have prevented it, and having known Dr. Jones but a short time, thought he would not believe me, and if he did he might get into trouble. I just could not tell it. I did not know about the law. Did not know but what I could prosecute him when my son was of age, and large enough to be of some protection. If I had had a father, or a brother, or anybody to have gone to, I would not have hesitated to have told it; but I was entirely alone, and I thought I could not go into court against such a man. I was married to Dr. Jones in the spring of 1874. I have six children by him, two boys and four girls.

I told Dr. Jones about this outrage last fall, 1891, just before the fair. Mr. Veal was killed during the fair this year. I told Dr. Jones about the occurrence about fair time last year. I often wanted to tell him before, and I felt that I couldn't die satisfied unless I did tell him; but I hated to have any trouble, and felt that I could not tell him. When I told Dr. Jones he was almost overcome with surprise. He said that nobody on earth but me could have made him believe such a thing. He would never have thought that anybody dared to treat me in that way. He said that he must get up and go to Fort Worth and kill that man. He said, "I feel that I can not bear it. I can not stand it." I begged him not to do it, and said it had been so long ago he had better not do it. After we had talked awhile, he said he would not bother or trouble him if he would just keep out of his way; but he did not think it would be possible for him to meet the man and let him live. He said he did not believe he could control himself if he met him. It worried him a great deal. He was restless at night and could not sleep. I could not help regretting that I had ever told him. I felt that I might have kept it to myself and saved him that trouble, but I could not do it. Up to the present time he has never been himself since I first told him. Mr. Veal came to my house in 1875, when my second son was a few weeks old. I was in delicate health at the time; had been sick for months before his birth, and was scarcely able to get around. My servant girl went to the door and invited him into the room. Before I knew who was coming, he stood before me. I was so shocked I didn't know what to say. I was always afraid of the man, and could not express myself as I wanted to. I said, "Why do you come here? You know you have no business in my house. It makes me miserable to see you." I hardly know what I did say to him; but I got him to leave as soon as I could. I was afraid to speak to him as I felt like speaking.

After I told him he had no business there, he came towards me and held out his hands a little. I said, "Get back, Captain Veal; you forget whom you are talking to; you forget where you are." I was terribly alarmed. He turned and went out. Captain Veal came to my house

again, about eight years ago, when I was living in East Dallas. I was in the kitchen, and one of the children said, "Mamma, a gentleman is at the door." I went to the back door, not knowing at which door he was, and not knowing who he was. He had come in the front door, and taken a seat. When I saw him I was much frightened, and said much the same thing as I said before. I said, "What do you come here for? You know you have no business here." I was not quite so frightened as I was before, because I was older. He said only a few words and left. My husband was not present at either of these interviews. Mr. Veal said nothing about taking liberties with me, and made no attempt at anything of the kind, except his motion, the first time he came. At that time he held out his arms towards me, as if he meant ——; well, not knowing what he meant, I told him not to come near me. He held out his arms and came towards me. I thought he would leave, but as he started to leave he came towards me. I said, "You forget yourself, Captain Veal; you forget who you are talking to, and forget I have some one to protect me." I was excited and afraid of the man, but repulsed him and kept him at a distance. I told Dr. Jones of both visits, at the same time I told him about the outrage. I told my husband what I had heard of the other outrages at the house where I was staying, at the same time, or soon after I told him of myself. Mrs. Cockrell visited at our house, and I had a conversation with her upon this subject, after I had told Dr. Jones of this affair.

Cross-examined: The outrage was perpetrated upon me in the spring of 1872, in the month of April or May. I do not remember exactly which. I do not know the day of the month, or the day of the week. I was 23 years old. Had then been a widow about eighteen months. My child was born in August, 1870. He was 20 months old. My father's name was James N. Smith. He died in 1862. He was an own brother to Jack Smith, known as Captain Jack Smith, who lived in Dallas in 1872. He had one grown son at that time, whose name was Elden Smith; but I don't know whether he was living in Dallas then or not. There was also a son named Jack. I don't know what his age was at that time. My husband died in 1870. I think Jack was 17 years old then, but am not sure. He was my cousin. My uncle was the nearest relative I had. Mrs. Cockrell lived near the river bridge, on Commerce Street. I do not know how many people were at the house that night. Her sons were away. I think both of her sons were away. Perhaps Alex. Cockrell was there, I do not know. I think Mrs. Cockrell, Mr. Veal, Mitch Gray, and myself were all that were at the house that night. There was no servant's room on the place. The servants only came there to work. I don't think they slept there. Mrs. Cockrell had a housekeeper, but I don't know whether she was there or not. Mrs. Cockrell, myself, and Mr. Veal were at family prayer next morning. I do not know whether Miss Lou Bryan, the

housekeeper, was at prayers or not. I think Mitch Gray was at family prayer. He had been there in July, and I think he was there then.

My room was upstairs over Mrs. Cockrell's. There was a wide hall dividing the house upstairs, and next to my room were a couple of rooms on one side the narrow hall between my room and Mitch Gray's. These rooms were eight or ten feet wide, and the narrow hall was about ten feet wide. I think it was about twenty feet from my room to that of Mitch Gray. The stairway went up into my room. It landed in Mrs. Cockrell's room. I could start from my room and go down into Mrs. Cockrell's room. There was a door at the foot of the stairs. I do not know at what hour of the night the outrage was committed. I had been asleep. I must have been asleep, for I knew nothing about it until Veal was standing by my bed. I don't know anything about the door, whether it was open or not. We never thought of locking doors then. There was no other way in which he could have entered my room except by the door. I never thought of locking doors, nor had the least fear, any more than if I had been in my father's house. Don't even know whether there was a key to the door or not. I do not know how long it was before I dressed for the morning. I didn't go to sleep any more. I do not know how long I lay in bed before I got up. When I discovered Veal in my room I cried out as loud as I possibly could. He started to put his hand over my mouth, and said, "Hush; they will hear you," or something like that. He seemed to be frightened because I spoke so loud. I didn't say anything after this, and I don't think he said anything. I don't know how long he remained in the room. It must have been a very short time. I was so frightened that I didn't know anything, only that he was pulling me away from my child, and I lost all power to speak. I had no knowledge of what occurred after he pulled me away from my child.

I knew Veal was there, and I knew he had outraged me. I do not think I knew anything scarcely. I do not know anything that was said. I do not know anything that was done, except that he outraged me. I know that he did that. I did not go to either the room of Mitch Gray or Mrs. Cockrell, and make an outcry. I knew then who it was that had outraged me. He did not attempt to disguise his name or appearance. He stood there and said nothing, but I could see, by the light in the room, it was Mr. Veal. I don't know whether it was lamplight or moonlight. I knew him when he spoke to me. I don't know whether there was a lamp burning in the room or not. Sometimes I would get my baby to sleep, and leave it burning. There were three large windows, with out-blinds, in my room, which was very narrow. I remained in bed sometime after he left the room; don't remember how long it was. At the usual time I dressed and went down, because I was resolved to tell Mrs. Cockrell. I don't remember whether I made my toilet as usual or not. I went down for the purpose of exposing the outrage which had been perpetrated. I

do not know whether the sun was up or not, but it was daylight.   I found Mr. Veal sitting in the room when I went down.   I don't know whether the others were in the room at first or not.   In a few minutes Mr. Veal had prayer.   I knelt down and engaged in the prayer.   Afterwards I went upstairs.   I was so crazy I hardly knew what I was doing.   I suppose they went into breakfast immediately after prayer.   Don't remember whether I went with them or not.

I left to visit my relatives in Kentucky in July.   I had an uncle, several aunts and cousins and other relatives there.   I do not remember seeing Captain Veal again before I went to Kentucky after that morning at family prayer.   I don't know where Captain Veal was living at that time. His home was at Hutchins, Waxahachie, or somewhere below here.   I don't remember now where his home was, even if I knew then.   I never told any one of the outrage until I disclosed it to my husband last year. I told him in the fall of 1891.   I did not know Dr. Jones in 1872.   I had never seen him, but had heard of him before I left for Kentucky.   Had heard that there was a new doctor in Dallas, but I had never met him.   I never told my relatives in Kentucky anything about the outrage.   I do not remember in what part of the city John Smith lived.   I think he had built his last home then, but I do not remember where he was living.   I was on friendly terms with his family.   I do not think Captain Jack Smith was in business in 1872.   I was in Kentucky over a year.   When I returned to Dallas I went to Mrs. Cockrell's and stayed there until I was married.   After my marriage with Dr. Jones I first kept house on Ross Avenue.   It was where Mr. Schneider and Mrs. Flippin live now.   We lived there over a year, but I think we moved away the second fall to the country, four miles from Dallas.   I think we moved out there in the fall of 1875.   I think we lived there a year or two.   I do not remember where we were living in 1876 and the early part of 1877.   We then bought a place on the Central Railroad from Mr. Ardrey, and we lived there about three years.   From there we went to a rented house on Ross Avenue.   Then we moved out on a farm.

I do not know where Captain Veal lived in 1879 and 1880.   I was living at Mesquite.   I lived near Mesquite five years.   I never knew but one place in Dallas where Captain Veal lived.   He lived on Swiss Avenue, or Gaston Avenue, or some avenue.   I do not know where Judge Coombs lives, but I know where he did live.   Judge Coombs lives just opposite Judge Burke's house.   I did not know that Mr. Veal lived on the other side of Sycamore Street. where Dr. Jones' feed stable now is, in 1880, 1881, and 1882.   I know the old Pleas Taylor place.   It is part of the property Judge Patterson once owned.   I do not know anything about a spring there.   I know the Pleas Taylor property, but know none of the houses. I do not know that Captain Veal ever lived at the Pleas Taylor place. I know nothing about Captain Veal's being in business here in 1880,

1881, 1882, 1883, and 1884. I must have been at Mesquite, for I know nothing about it. I do not know the firm of Veal, Hogan & Reynolds. I heard that my husband rented a house from Mr. Cooper. I was never in the office of Veal, Hogan & Reynolds in my life. Never was in the office of Veal, Cooper & Co. Veal never looked over any of my papers after the outrage. I never consulted Captain Veal on business. I never wrote him a letter in my life, except the few lines written on the morning after the outrage. My husband neither showed me any letters nor told me that he wrote to Mr. Veal. I did not know that Mr. Veal was here before his death, until I saw his name in the paper that morning. I had heard of his being in town once before that time. I do not remember when that was, but it was sometime this last year.

It was after I had told my husband about the outrage that I heard Veal was here, but I didn't see him. Dr. Jones did not see him. I remember the meeting of ex-Confederates here, for the purpose of going to New Orleans, last April. We had four of the veterans at our house at that time. I heard afterwards that Veal had been here then. None of the Confederates stopped at our house during this last fair. There were two at the time the veterans met here before. I think it was the time they went to New Orleans. We had two at our house one night, and four the next night. Two of them were from Waxahachie; one of them was a Mr. Sems, or Sims. I don't remember the other man's name. They were from Ellis County. My husband had a pistol. I don't know how long he has had it. He had it a good while. He has had one nearly all the time since we have been married. Sometimes he would have a shot gun, and sometimes a pistol. My husband has not bought a pistol recently. He did not send off after one, nor get one during the last few months. He had but one pistol. Sometimes he kept it at the house, and sometimes he carried it out with him. He has left it at the house several times within the last two months. I don't think the pistol was at the house on the day of the killing. I was not at the fair grounds the day before the killing. My husband was out there that day. He wanted me to go, but it was not convenient, and I did not go. I expected him to go, though. He was anxious for me to hear Mme. Decca sing, and insisted that I should go Tuesday morning.

He went to the fair grounds on Monday. I think that was the first Confederate day. I do not know whether or not Veal made a speech out there that day. Dr. Jones said he went out about 2 o'clock. He went down to the store first. He did not tell me anything about Veal making a speech. I do not think he knew that Veal was out there until he read it in the paper next morning. He read the paper before he went down into town that morning. He was reading the whole piece about the fair, and said that Veal was there and made a speech. He did not say he heard the speech. He said that he did not know that Veal was out there that

Monday. I kept this outrage to myself for twenty years, for the simple reason that Mr. Veal was a man of high standing, and I was alone and had no brother or father to advise me, and nobody to help me, and I had such a horror of going into the court room and of making the thing public. I had more horror of the court room then than I have now, because I was almost a child then, was timid and shrinking, and could not go into the court room then. I knew that Veal would say anything, and tell false-hoods about me, and I was a lady. He stood no higher in Dallas, as a man, than I did as a lady, but I was almost alone, and had been away, and Dallas had changed. My uncle, Jack Smith, was not wealthy then. He might have been called well-off.

Wallace Peak had married into my family, but I don't know whether he was living here then or not. He was influential and stood well. I had a good many acquaintances in Dallas, but I did not tell any of them, because I thought my son would grow up and avenge my wrong; but he was too much like me, and I knew it would ruin his life. He was so young, and I could not tell him from what I saw in his nature and dispo-sition. I did not know Dr. Morgan, but knew his wife when she was living at my uncle Jack Smith's. I was there when she lived there.

On re-direct examination, she testified: My uncle Jack Smith was the nearest relative I had. He was at that time an old man and almost a helpless cripple. He had lost both hands and was very old. My mother died before I could remember, and my father when I was thirteen years old. Judge Patterson was my guardian. He had charge of my business. James M. Patterson had charge of my business until my marriage with Mr. Bullington. Mr. Kendall was my agent while I was away from Dal-las. My uncle Jack Smith never attended to any business for me. I did consult Wallace Peak sometimes, but I never asked my uncle's advice about anything.

Mrs. Lizzie Morgan, for applicant, testified: I am acquainted with Mrs. Sarah Jones, the wife of Dr. R. H. Jones. I have known her from her childhood, ever since about 1855. She has been living nearly all of her life in Dallas. She was off at school sometimes, and when she was married she was away from home awhile. I never saw a more modest or a more virtuous girl than she was.

Frank Cockrell, for applicant, testified: I have been acquainted with Mrs. R. H. Jones from her childhood, as far as I can remember. She was raised in Dallas County, and so was I. No purer woman lived. She was considered modest and retiring. Her reputation is, that no purer woman lived anywhere. This has been her reputation from childhood up. I knew W. G. Veal. He lived in Dallas awhile. He was a man I first knew of as a preacher. His reputation was somewhat loose. He was a public man, and his character well known. He was public spirited. I knew his reputation, based upon hearsay. His general reputation,

based upon hearsay, was bad in a great many respects. I do not mean he was dishonest, but it seems he placed very little value upon female virtue. I was at college from 1872 to 1878, but would hear through the mails during the summer about him; but my knowledge dates from my return from college, in 1878, until the day of his death.

Mrs. Sarah Mauvoise, for applicant, testified: My maiden name was Sarah E. Crow. I was raised across the river, six or seven miles southwest. I went to the first school that was ever in Dallas. I married John Penn. Afterwards, I married Andrew Mauvoise. I know what was told about this preacher W. G. Veal's virtue. I heard him preach at the camp meeting, held at the old camp ground, before the war. He was very much slandered. It was thought he did not treat the young girls right at the mourners bench. The old people told us that, and told us to keep away.

S. P. Cross, for applicant, testified: I live in Dallas. I have lived there about twenty-one years. I know Mrs. Jones. I have known her about ten or twelve years; that is, have had a speaking acquaintance with her. I never heard her reputation as to virtue and modesty called in question. I can not say that I knew her reputation as early as 1872. Her reputation is good. I knew Captain W. G. Veal during his lifetime. Have known him for twenty years. I know, by hearsay, that his reputation was bad with reference to lewdness and licentiousness, and otherwise, in the community in which he lived.

T. G. T. Kendall, for applicant, testified: I have lived in this county since 1864. I have known Dr. Jones about twenty years. I have known his wife since 1865. I had charge of her business at one time. It was after her first marriage, to Mr. Bullington. I think it was during 1869 and 1870. In March or April of this year defendant talked to me about the outrage upon his wife. Dr. Jones asked me for an interview, and told me he wanted to talk to me about a very serious matter. We went off into a room, and he told me about the outrage perpetrated upon Mrs. Jones by Captain Veal. He was much excited and wrought up. He broke down and shed tears while telling me about it. He told me that his wife told him about it. He told me the details of the statement. I think he said it was while she was boarding at Mrs. Cockrell's. I did not hear all of Mrs. Jones' testimony yesterday, but I heard her cross-examination

I think Dr. Jones told me, substantially, what his wife testified on the stand. I can't remember all that I said to him on the subject. We talked a long time, and I think he has mentioned it on every meeting between us since. He seemed very much wrought up, and very much excited when talking over the matter with me. I have seen him break down and shed tears on several occasions about it. I went to see his wife, after he made this statement to me. I told Dr. Jones I hardly believed it,

and would believe it from nobody but his wife. I went to see her, and got it verified from her own lips. She didn't go into details. I said, "Mrs. Jones, the doctor has just detailed to me a statement of what occurred between you and Captain Veal years ago. I want to know, from your own lips, if this is true?" Her reply was, " Yes, Mr. Kendall, every word of it." I said, " I am satisfied. I only wanted a confirmation of what was related to me by Dr. Jones." I remember the occasion of the Confederate reunion at New Orleans. Dr. Jones did not go. He said he wanted to take his wife to Alabama. He wanted to take in the reunion at New Orleans, and then go on to Alabama and return, but for fear that he would meet Captain Veal on the trip he would not go. He told me that he had never seen Veal.

My last conversation with Dr. Jones with reference to when he saw Veal was, I think, about reunion time here, during last fair. It might have been a day or two before. It was in my first conversation with him, after the killing, that he told me about it. He simply stated that he had not seen Veal. He acted very excitedly and nervously while talking to me; sometimes almost like a crazy man. I talked with him last a few days before the homicide. Every time I met him, he would want to say something about the matter. Dr. Jones told me that if he should meet Veal he couldn't control himself; that he would be bound to kill him. He said sometimes, he ought to go to Fort Worth and kill him. That was the gist of the conversations we had at the different interviews between us. Captain Veal lived in Fort Worth; that is thirty-two miles from Dallas. Dr..Jones lived in the city of Dallas. He lived here about twenty years, I think.

Dr. R. H. Jones, in his own behalf, testified as follows: I had not seen W. G. Veal in Dallas up to the day of his death, since my wife told me of the outrage perpetrated upon her. I had not seen him for eight years. The day I killed him was the first meeting I had with him since I had been told about the outrage. I believed every word of my wife's statement. I would believe anything she would tell me. I know she is incapable of telling anything but the truth. My wife told me of the subsequent meetings with Veal, at the same time she told me of the outrage.

It would be impossible to say what effect this information had upon my mind. I don't think I ever received such a shock; in fact, I could hardly believe it. I thought she was the last woman on earth that any man could be base enough to insult, much less do anything of that sort to. The fact was, that it crazed me. My first impulse was to get on my horse, go to Fort Worth, and kill Veal. My wife prevailed on me not to do this. She said I might get killed, or the friends of Veal, who knew nothing about it, might kill me. She said it would kill her if I should lose my life. From the time she told me about it I was almost crazy. At

times I thought I would lose my reason. It would come on me in the night, when I would go to my bed. The vision of that man, as she portrayed him, would come up before me, between us. It was all the time haunting me, and would come between us. I do not believe that under any circumstances I could have controlled myself when I saw Veal. I was terribly excited, and I do not think that I could have done otherwise than I did. I did not expect to see W. G. Veal when I went into that building on the day of the killing. I went up there the morning before and got a badge. I went up there that day to enquire if General Lowery, of Mississippi, who was in my company, was there, and also to find out whether Captain B——, brother-in-law to Judge Aldridge, was there. In fact, I met Judge Aldridge, and asked him if B—— was up there. I was looking for them. I was a member of Camp Sterling Price. I did not know that W. G. Veal had any connection or business at Camp Sterling Price that would carry him there. I do not think he is a member of that camp, but I don't know. I am almost certain he is not.

On cross-examination: I had known about the outrage a little over a year when I killed Captain Veal. I had never seen him during that time. I thought I knew Veal by sight, but when I saw him in the Exchange building, I was not perfectly sure that it was he, until I asked Captain Mendez. I had not seen him for about eight years before that. I was out at the fair grounds the day before the killing. I did not pass by Veal out there. If I did, I did not see him. I know Ben Cabell. I have no recollection of seeing Ben Cabell at all that day, nor of having any conversation with him. I think I would remember such a conversation if I had had one. I did not buy the pistol I had. I exchanged with Mr. Worden for it about a year ago. I generally carry a pistol. I did not get it with the intention of hunting up Captain Veal. I had it every morning; carried it to my store, and put it in the drawer down there. I know Mr. Chockley. I was at my office talking one day, and I remember pulling out the drawer, in which I kept matches and tobacco. Chockley was there, noticed the pistol, and said something about it. I said it was a shame to be seen with a pistol, but that there was a party whom if I should meet with, one or both of us would be killed. I do not think I said, "when I meet him I intend to kill him." I had a knife there which I used for cutting twine, sacks, etc. I don't remember telling Chockley anything about the knife. Something may have been said about it, but I do not remember it. It may have been a couple of months before the killing that this conversation occurred.

I never wrote a letter to Captain Veal over my signature. I wrote him one letter, not over my signature. That is all I remember distinctly about. I may have written others. I do not remember. I read in the newspaper accounts of rape, outrage, and one thing and another, and I would actually be so crazy that I would not know what I was doing. I

may have written the letter before me. I do not think it is my hand-writing. I may have written it. I was in such a condition of mind that I hardly knew what I did. I can not say whether or not I wrote this sec-ond letter. I neither affirm nor deny writing either of the letters before me. I have letter heads in my business. They were printed by Mr. Bibb. I think the "Dallas, Texas, 189—," on them was printed in black ink, not in blue. Mr. Seay has some of them here. The handwriting of this third letter is not mine at all. Probably I wrote it. I hardly know what I did. I hardly think I wrote either of the first two letters. I had no paper like that, and if I had written them I don't think I would have headed them at Dallas. I do not think I backed these envelopes. I do not think I could address them that way, but I may have done so. I don't know what I did. I had just become so crazy that I hardly knew what I did. None of them are in my handwriting. I do not remember whether or not I told Tom Trotman and Judge Kendall, in July, that I had written several anonymous letters to Veal in Fort Worth, and warned him not to come to Dallas. I did write him one or two letters; probably two or three.

I do not know Sims of ———— Hill, Ellis County. I think one of the gentlemen who staid at my house during the Confederate reunion, last April, may have been named Sims, but I may have been mistaken. He was from Ellis County. He brought up Captain Veal's name, and asked me if I knew him. I told him I did. He said Veal had made a speech at the hall the day before. I told him I did not hear it. I said I was crippled, and got on the reception committee for the Central Railroad. I told him I knew Veal to be one of the grandest rascals living. The con-versation occurred in my parlor. I know General Cabell. I met him at the foot of the stairs as I came down on the morning of the killing. I did not meet him going up the stairs. I had no conversation with him before the killing. I met him going back downstairs. Some one said, "What is the matter?" I said, "I have killed Captain Veal." I did not tell General Cabell why I had killed him. He did not ask me why I did it, and I did not say, "Because he raped my wife." He did not ask me when, and I did not say, "Never mind, it will come up at the proper time."

On redirect examination: I heard a good deal about Captain Veal, and knew what his reputation was at the time my wife told me of the outrage. The crowd was large at the fair grounds, and I saw but few people I knew. It was easy to pass friends without recognizing them. I saw Dr. Thruston going out to the grounds. I asked him about the Con-federate reunion. He said it was over, and there would not be anything else until 4 o'clock the next afternoon. I wear glasses. My eyesight is very poor. I have frequently passed friends who spoke, and I did not see them. My wife has frequently called my attention to the fact. My eyesight is imperfect. Even with glasses, it is difficulty to recognize

friends.    I did not see anything of Captain Veal at the fair grounds that day.    When I got there I went into the music hall to hear the music and singing.    Was informed that the exercises of the Confederates were all over with.

Ignacio Gregory Prezedmojski, for the State:    I know the defendant, Dr. Jones.    I only knew Veal at the time he was at Camp Sterling Price. Knew who he was when he came.    I witnessed the shooting which resulted in Veal's death.    They were in the room of the Trans-Mississippi department, at the headquarters of Camp Sterling Price.    A young lady came in.    She was Judge Watts' daughter.    She asked me if certain gentlemen were there from Mississippi.    I went to Mr. Mendez and asked him about them.    Mr. Mendez was not well.    Jones was about four or five feet from Mendez, sitting down, smoking a cigar.    I turned to the young lady, and gave her a chair.    (At this point the witness indicated the position of the doors in the room, and of the furniture in it and his own position.)

Dr. Jones got up from the chair and stepped to the door. He came to the other door, and put his foot about to the edge of the carpet, stopped, and leveled his pistol. He was about six and a half feet, perhaps more, from Veal when he fired. Both the young lady and myself witnessed it. Captain Veal had his pencil in his right hand, and his other hand on the paper. His head was close to the paper. About that time Dr. Jones shot him. Nobody saw the shooting except the young lady and myself. Dr. Jones said, "I killed that son-of-a-bitch; he has raped my wife, and a good many other women besides. I killed him." Veal was sitting at the table, with his pen in his hand and his face down near the table, when the shot was fired. His face was three or four inches from the table. When the shot was fired, the pen dropped. His feet were under the table. He had both his elbows on the table. The shot went into Veal's head. The ball took effect in the left temple. Captain Veal never moved. He didn't appear to know anything that happened. Jones went to the door, then came to the other door, and shot Mr. Veal. Dr. Jones did not seem to be at all excited before he fired the shot. His face turned as white as snow after the shooting. He was not excited.

General W. N. Bush, for the State, testified: "I knew Captain Veal in his lifetime. I first met Dr. Jones on the morning of the killing. I was sitting at the table with Captain Veal and another man. We were on the north side of the table, and Veal sat opposite us, I think. Veal was reading to us at the time of the shooting. I did not see Jones when he first came in. I do not know exactly when he entered. I do not know Veal's position exactly. The pistol shot first attracted my attention. The shot killed him instantly. His face dropped on the table. When I first noticed defendant he was six or eight feet from Veal. He was two or three feet from the door in the hall. If Jones had been in the room, he had gone back into the hall when I first saw him. They told me it was Dr. Jones. Captain Walker, Captain Veal, and myself were the only persons in the room when the shot was fired."

Cross-examined: When I saw Jones he seemed to be excited, but not more so than any other man would be after committing such an offense. I heard him say that deceased had committed a rape upon his wife and other women of the town.

Captain S. P. Mendez, for the State, testified: I knew Captain Veal in his lifetime. I know Dr. Jones. I remember the circumstances of the death of Captain Veal on the 25th of October last. At the time of his death I was in the north room of the encampment. I saw Dr. Jones a short time before the death of Veal. I can not tell how long before. I was sitting in the room attending to the duties of my office. Dr. Jones came in and sat by the side of me. I don't know how long he sat there. It may have been something over five minutes. I did not see Dr. Jones when he left my presence. So much excitement was going on at the

Camp, people passing in and out of the rooms, asking questions, etc., that a man in my position could not tell whether or not Jones was excited during this conversation with me before the killing. I saw Jones after the shooting. He was very much excited. As he came in the room with the smoking pistol in his hand, he remarked, "Veal has raped my wife and I killed him." I don't know whether he was excited before that or not.

Cross-examined, he testified: Jones was near me when he asked me the question about Veal. I said to him, "Doctor, I feel very badly and very much worn out. I am tired of all this thing, and wish it was all over." I remember distinctly that Jones said, "Is Veal in the other room?" I turned with my face nearly to the east door, leading from the north into the south room, and said, "Yes, that is Veal in there." Shortly after this I heard the report of a gun, and shortly after the report Jones came into the north room where I was sitting, with a smoking pistol in his hand. He said, in an excited manner, that Veal had raped his wife, and he had killed him. I immediately went to the sheriff.

General W. L. Cabell, for the State, testified: I know the defendant, Dr. Jones. I remember the circumstances of the death of Veal at Camp Sterling Price headquarters. I was in the building that morning. I met Jones a short time before the killing. I was going down, Dr. Jones was coming up. He seemed to be calm, except he was a little different in his looks. I saw nothing about him to indicate anything unusual. I next met him when he was about half-way from the steps to the lower floor. This was after the shooting. He was in charge of Mr. Van Horn and a gentleman by the name of Woody or Moody, I don't know which. When I got inside, Dr. Jones was just coming to the last entrance. Van Horn was on the south side of him and the other gentleman on the north side. I remarked, "Doctor, what in the name of God have you done?" He said, "I have killed Veal." I said, "What in the hell did you kill him for?" He said, "He tried to ravish my wife." I said, "When?" He said, "Never mind." Jones appeared to be just as usual. I saw nothing unusual about him.

Ben Cabell, for the State, testified: I know Dr. Jones, and knew deceased, Captain Veal. I recall the day of Veal's death. I think it was on Tuesday. I was on the fair grounds the Monday before. I saw Dr. Jones out there between 2 and 4 o'clock in the afternoon. While talking to Jones I saw Veal walk out of the south end of the exposition building and walked north. He came out of the south entrance and walked south to within seven or ten feet of where Jones, Fisher, and I were talking. I think Jones and Fisher were facing the building more than I was, because Jones, when he left me, walked straight up to the steps, and I turned and walked with him. I can not say Dr. Jones was facing Veal as he came out of the building, but we were all three standing there. I

know I saw Veal.   Jones and I walked on up the steps.   We were talking as Captain Veal passed out of the building and passed on.   I heard Veal speak to some gentlemen twenty-five or thirty feet off, after he passed out of the building.   He spoke in a loud voice and I heard him distinctly.

Judge R. E. Burke, for the State, testified:   I knew Captain Veal in his lifetime.   I remember very well the day of the week on which Veal was killed.   It was Tuesday.   On Monday, the day before the killing, I was in the city, and out at the fair grounds.   Monday was the beginning of the Confederate reunion here.   I saw Dr. Jones, the defendant, out at the fair grounds that day.   I saw Captain Veal out there.   I went up on the stage in the music hall, and the first man that I saw to speak to was Captain Veal.   He was on the stage during the whole proceedings.   Directly after I got there, Governor Ross began his speech.   Captain Veal was sitting as close to my right as he could sit, as we were crowded on the stage.   Dr. Thruston sat immediately on my left.   Dr. Jones was sitting about four or five or six feet back from the stage, and from the speaker. I can not say how long Dr. Jones and Captain Veal sat there; but I remember speaking of it to Dr. Thruston after Veal was killed.   I know it was Dr. Jones I saw.   Veal was active on the stage, and walked across it a dozen times or more.   He went behind the scenes, and was walking backward and forward a good many times.   I saw the defendant, Jones, soon after the killing.   I was having my shoes blacked, in front of the court house steps, and Dr. Jones passed within six feet of me, and I accosted him, as I always do, in a friendly way.   He came back and shook hands with me.   Jones' manner was then just as it is now.   I never would have known anything had happened.   He was just as calm as he is now. We have always been friends, and we shook hands.

J. F. Van Horn, for the State, recalled:   When I met Dr. Jones, immediately after the shooting of Veal, he seemed to be perfectly cool. When Dr. Jones came down and was talking about his wife, there were no tears in his eyes.   I noticed his eyes particularly, and if there had been tears in them I certainly would have seen them.

Frank Bowles, for the State, testified:   I know Dr. Jones.   My business is making abstracts of titles.   I am working for S. W. S. Duncan. Dr. Jones worked at my office for a few months.   Here is some of Jones' handwriting, done at my office.

On cross-examination:   I am familiar with Jones' handwriting, and I saw him writing on this.   I do not know that I saw him write this particular piece, but these are the books he was working on, and he worked on this one, but at what page at any particular time, I can not tell.   But I identify this as his handwriting.   I saw him working on this index, and I know this is his handwriting.

Postal Card:   The State introduced the following postal card, said to have been written by defendant to Captain Veal, which was read, over

defendant's objection, because not shown to be in his handwriting. The postal card is as follows: " Have you found any unprotected pregnant women, or poor old maids, or helpless widows, and honest mechanics' wives to outrage lately ? Why don't you come to Dallas ?"

The postal card bears no signature. It is addressed to " Rev. Capt. W. G. Veal, Rapist, Ft. Worth," and is mailed at Dallas. It is postmarked September 11, 1892, at 5 p. m.

Reuben C. Ayres, for the State, testified: I am engaged in the banking business. I have filled nearly every position in the bank. My business requires me to examine handwriting, but I can not claim to be an expert. It is part of my duty to notice handwriting. (At this point counsel for the State exhibited a letter to the applicant, and asked him whether or not it was his handwriting; to which he replied that it was. He then showed the letter to the witness Ayres, and asked him to state whether or not the letter and the postal card were written by the same person.) I believe I would have to take them both as the same handwriting; but one appears to be a disguised hand. They are not alike in every particular. There are many particulars and letters which are alike in both. In this letter here the letters appear to be written by the same person who wrote the postal card. The general character of the letters is unlike; but there are certain characters in each which are alike. If the same person wrote these two letters, it was his intention to disguise his hand in one of them.

The first letter is as follows:

" Mesquite, Texas, Oct. 3rd, 1882.

" *Messrs. Veal, Hogan & Reynolds, Dallas:*

" Gents—I have concluded to sell my farm, two miles north of Mesquite, containing 689¾, with over 500 acres in cultivation. Good three wire fence, nine good tenant houses, crib, stable, wells, etc., all new; better by far than the average improvements in the country. Also 251½ acres, one mile east of the above, with 30 acres in cultivation, good houses, well, etc. All in good order. Farm can easily be enlarged, and the land very fine, with timber and firewood on each to last both places for all time. Taken together, they form the most desirable farm property in Dallas County. My price for the property entire is $19,500 in cash. The title is perfect. I would sell for one-half cash and the balance on one and two years, with 10 per cent interest. I am safe in saying there is not to be had such a bargain in Dallas County, for I am satisfied the farm will be worth $40 per acre in five years from to-day. If you find a purchaser, send him to me at Mesquite, and I will take pleasure in showing him the property. Respectfully,

[Signed]        " R. H. Jones.

" P. S.—I do not wish to lease the land."

The second letter is as follows:

'' Dallas, Texas, July 4, 1892.

" You vile old hypocrite:   Why don't you pay us a visit?   There are quite a number of us here who will be glad to see you.   Come over and save us the trouble of going to Fort Worth after you.   You are doomed, and you had as well make up your mind to-day.

[Signed]                                     " One of Them."

The third letter introduced is as follows:

" June 18, 1892.   You hypocritical old skunk:   The old lady is dead, as you no doubt know; but she left this record behind of your villainy: First.   The outrage of the poor old maid that lived with her.   Second. The poor innocent young widow.   Third.   The man and wife you separated.   Fourth.   Your sister-in-law you got a baby by and had an abortion produced on.   Fifth.   The pregnant woman you attempted to rape and had to pay $1000 for.   And last, as far as she knew, the attempt on herself and the fight with the camphor bottle.   Now, what do you think of this record for a Methodist preacher and Master Mason and a Confederate veteran?   Go and drown yourself, and go so far away that nobody that ever knew you will ever hear of you.   I have been your life-long friend, but am so no longer; but for the sake of the church and the Masonic order, both of which I am a member of, I thought I would warn you, that from what my wife has heard, you had better get out of the country, for the fate of the Arkansas negro was mild to what you may expect when the friends and kin of this woman get hold of you.

[Signed]                            "A Member of the M. E. C. S."

Dr. A. A. Johnson, for the State, testified:   I knew Captain Veal in his lifetime.   I know Dr. Jones.   I was in Dallas during the Confederate reunion.   On the first day of the reunion, or the second day, this fall, out at the fair grounds, I was standing at the south end of the main building of the exposition, perhaps six or eight feet from the steps.   Captain Veal came from the music hall and stopped and shook hands with me. He was talking with me, and I happened to look up, and right in front of me stood Dr. Jones, on the upper step of the gallery of the exposition hall.   He was looking out over the crowd.   He was looking over toward us.   Veal was dressed in a Confederate gray uniform.   I noticed Jones standing there some minutes.   Veal and I talked a few minutes, and he shook hands with me and went on.   He went west after leaving me.   He did not go in the direction of Jones.   Jones was about forty feet from where we stood, perhaps not so far.

On cross-examination:   I think it was about twenty-five or thirty feet from Dr. Jones to Captain Veal.

Applicant in rebuttal.—Frank Cockrell, for applicant, testified:   I did

not hear the testimony of Dr. Johnson on day before yesterday, but I saw a publication of it. I saw Dr. Jones on Monday before the killing of Captain Veal. I saw him at the fair grounds. It was about 4 or 5 o'clock in the afternoon, standing in front of the exposition building, at the south main entrance, talking to a lady and my wife and me. Mrs. Chadwick was the lady with us. We were standing at the steps, and Jones was a few steps below, facing me. From his position Dr. Jones could not have seen any one coming around the corner from the music hall. Dr. Jones could have seen no one except persons passing directly behind me. I did not see Captain Veal in the crowd. I do not know whether or not Dr. Jones left that place at the same time we did.

Tom Trotman, for applicant: I know Dr. R. H. Jones. He is my half-brother. I was at the fair grounds and on the stage the first day of the meeting of the Confederate veterans, during the first day of the fair. I did not see my brother there at all that day. A man could not have seen Captain Veal from the third or fourth row, unless he had been sitting near the end. I glanced over the audience two or three times. I don't think I saw Dr. Jones at all that afternoon.

Colonel W. L. Thompson, for applicant, testified: I am acquainted with Dr. Jones. I am adjutant of Sterling Price Camp, and adjutant-general of the Trans-Mississippi Department, United Veterans. I was out at the fair grounds on Monday, the first day of the reunion. I went down and asked the veterans who were sitting on the front rows to get up and move back, to let the visiting members and the band have the front seats. I did not see Dr. Jones there that day. He was a member of the camp, and had been paying his dues to the camp.

Cross-examined: I asked them to vacate the front row of seats when the band came in. Captain Veal was on the stand and was very conspicuous, and I saw him. Early in the morning, before the speaking commenced, Veal arose on the stage and called off certain facts about the Monumental Association, of which he was secretary. General Cabell introduced Governor Ross, who made the speech of welcome, then Cabell introduced General Harrell. He made an address, and the recitation of a poem from Mr. Marshal took about thirty minutes. After this, by request, Captain Veal recited an original poem. It took him probably ten minutes, and I think this concluded the ceremonies of the morning.

Dr. R. H. Jones, in his own behalf, testified: I took the car for the fair grounds on Monday before the killing, at about 15 minutes to 2 o'clock. I boarded the car at the corner of Akard and Main streets. I came from the city hall. I understood that the Confederate meeting would be held at the city hall. I understood that it had adjourned until 1 or half-past 1 o'clock. I went there about that time. I had just eaten my dinner at Lang's restaurant, and was smoking a cigar. I had walked up to the city hall, and was standing there and saw Mr. Bauer walk across

the street. He came over and talked to me. I told him I understood there was to be a meeting of the Confederate veterans there. In the meantime the county executive committee passed along about 1 o'clock. I recognized in the crowd Jim Cochran and Bill Cochran and Bob Cowart and others. As they passed I went into the city hall rotunda. I went to the council chamber, where I thought the meeting would be; saw nobody there, and I asked the janitor about it. I asked him if there was not to be a Confederate meeting there. He said he didn't know, but said there was one there that morning. I came out and met Bill Parry and talked a few minutes to him. He said he thought I was mistaken about the meeting. I went out then, got near the corner, and took a street car.

It was 1:30 o'clock when I got down to the corner. The first two or three cars were so crowded that I couldn't get on them. I was lame in my ankle, and didn't want to get on a crowded car. I finally got a car and got to the fair grounds a little after 2 o'clock, and going in I met Dr. Thruston, and stopped and spoke to him. I asked him if the meeting was over. He said, "Yes, sir, the meeting is over, and there will be nothing more here until to-morrow evening at 4 o'clock." I walked on a few feet further and met Captain Swink standing at the ladies' restaurant. He asked me if I would not come and patronize him. I said, "No, sir, I have just had my dinner at Lang's." He said, "All right, patronize us in the future." I went on to the music hall then. The band was playing, and then a lady came out and sang, whom I took to be Mme. Decca. I afterward found out I was mistaken. I had not seen Mme. Decca up to that time. I entered the music hall from the south door, and went around to the left, and sat about three benches from the upper tier, which would throw me about opposite the left side of the stage—that is, to the right side of the stage looking at the stage. I sat on the north side of the stage. I sat there and listened to the song and encore, and while the band played one tune; then I went through the exhibition hall, looking at the exhibits.

I met a man from north Alabama, where I was raised. He was related to the Whitmans in Alabama. I talked to him about Bob Whitman, who was living in Waco. Then I came through the Dallas County exhibit, and walked directly out of the building down to a bench sitting on the left side of the walk leading to the building. As I was in the act of sitting down a gentleman came up and handed me a circular. I told him I didn't want it. He said, "Take it, it might be of interest to you." I saw something about "Chandler's Treatment," and looking at it, saw that it was an advertisement of Chandler's Treatment for obesity. The gentleman sat down by me and told me that he would send me a trial package of this treatment. Standing alone and close in front of me was Joe Fisher. I got up and talked to him, asked him about Jules Peak,

who was living in Shackelford County, where Fisher lives. We were tolerably near the steps leading into the exposition building. I looked up and saw Mrs. R. A. Chadwick standing near the post out toward. the west. I walked up and stood and talked to her sometime, and then Frank Cockrell and his wife came up. We stood and talked awhile. Frank Cockrell went into the building for some purpose and came back. Then he and his wife left. I talked to Mrs. Chadwick awhile; looked at my watch and found it nearly 5 o'clock, and said, "It is time I was going home."

I went to the car and got on. After a while the car got off the track, and we had to send for a jack-screw and jack it up. It was 6 o'clock before we got off the car. I went to my office, got in my buck-board, and went home. Before going to the fair grounds that day, I saw Mayor Connor just opposite Swope & Mangold's saloon. Colonel Kirby met us there, and we all went in there together, and Major Kirby proposed that we take a drink. I excused myself, and took a cigar, saying that I had not had my dinner. Major Kirby gave the bartender a check, and then Major Kirby called my attention to his face, and said something about having an engagement to speak somewhere, and was speaking of his face in connection with it. I went out, and left Major Kirby and Mr. Connor in Swope & Mangold's saloon. I went a few doors above there into Lang's restaurant, and ate my dinner. I went up to the desk and paid for my dinner, and lighted my cigar and left. Just as I went out of the door Mayor Connor came along again, and I walked up to the other corner with him. Some one spoke to him, and I remarked that I was going to the city hall, as I understood the Confederates were going to meet there in the afternoon, and I left Mayor Connor. I never saw Captain Veal at the fair grounds; had never seen him to recognize him since he left Dallas to go to Fort Worth. The last day I remember seeing him was when I moved into Dallas, on the first day of December, 1884.

My eyesight is very poor. In anything like a casual glance at persons I frequently fail to recognize my best friends. I very frequently make mistakes. I made a very egregious mistake with the wife of counsel, Judge Muse, which I reckon she will remember. I was standing at Pace's drug store, and Mrs. Muse was standing nine or ten feet out from the store. Several people were standing in front of the store, and the question arose as to who she was. I said it was Miss Thomas. Some one said it was not. I said, "I will demonstrate it by going and speaking to her." I walked up and spoke to her, and she said I was mistaken. She said, "My name is Mrs. Muse." I extended my hand and said, "Are you the wife of Judge Muse?" She said, "Yes." I said, "I will take the liberty of introducing myself, then; I am a friend of your father." I have had to wear glasses since I was 18 years of age to write with. I wrote constantly on the books in the county clerk's office; it injured my eyes.

I have been a constant smoker, and am satisfied that I injured my eyesight by it. I am sure that I have "tobacco amaurosis."

Dr. S. D. Thruston, for the State, testified as follows: I knew Captain Veal in his lifetime. I know Dr. Jones. I was at the fair grounds on the Monday before the death of Veal. I saw the defendant, Dr. Jones, come into the hall that day. It was late in the day when he came in. It was after 1 o'clock; possibly it may have been half-past 1. I saw Captain Veal on the stage. He sat three or four seats from me to my right—to the right of Judge Burke. I did not notice Veal on the stage when Dr. Jones came into the hall. He was there before and afterwards. I did not look to see if he was sitting there when Dr. Jones entered the hall. Veal made a little speech or oration afterwards. Dr. Jones took his seat three or four benches from the end of the stage. He was about twenty feet from where I was sitting. I was on the extreme left of the stage, and Dr. Jones was sitting slightly to my right. I was to the right of the audience, fronting the stage. I observed Dr. Jones in the audience only a few moments. I recognized him when he came in. About 2 o'clock Veal made a speech, or recited a poem. Veal recited the poem after Jones came in. Jones came in about a half-hour before the closing of the ceremonies of the day. I do not remember seeing Dr. Jones at any time during the day except on that occasion. I do not remember who was speaking when I saw Dr. Jones. I do not know who Dr. Jones sat down by.

General W. L. Cabell, for the State, testified: I was on the stage at the fair ground on the Monday before the killing. I saw Dr. Jones in the audience while the exercises were going on. I think it was between 1 and 2 o'clock that I saw him. Jones was coming down the aisle toward the front of the stage. I saw him take a seat five or six feet from the stage, four or five benches back from the front. Captain Veal then was sitting on the stage. I introduced Veal to the audience, and he recited a poem. I saw Dr. Jones at the time I introduced Veal, and I saw him while Veal was speaking.

No briefs have come to the hands of the Reporter.

SIMKINS, Judge.—Appellant was on the 4th day of November, A. D. 1892, indicted for the murder of W. G. Veal, and upon the 10th day of November following sued out a writ of habeas corpus before the Hon. Charles Fred Tucker, judge of the Forty-fourth Judicial District. Upon hearing, bail was refused, and an appeal was taken to this court.

Bail should be granted in murder cases unless, upon examination of all the evidence adduced, the court should conclude that the proof of guilt is evident, and the accused would be convicted of murder in the first degree if the law was administered. The guilt of the accused may be evident, though there may be conflicting testimony. Ex Parte Smith, 23

Texas Ct. App., 125; Drury's case, 25 Texas, 45. "Proof is evident" if the evidence adduced on an application for bail would sustain a verdict convicting the applicant of murder in the first degree. Foster's case, 5 Texas Ct. App., 625.

It is well settled in this State, that after indictment found for a capital offense, it devolves upon the applicant to show he has a constitutional right to bail because the proof of his guilt is not evident. Scoggin's case, 6 Texas Ct. App., 546; Randon's case, 12 Texas Ct. App., 145; Smith's case, 23 Texas Ct. App., 123. In the case at bar, to obtain bail, it devolves upon the appellant to show—first, that when the intention to kill was formed, the mind of appellant was not calm and sedate, and in a condition to comprehend the nature of the act, and its probable consequences; and secondly, that it was not in such condition when he killed deceased; for, although the design to kill may have its inception and origin in an inflamed and excited mind, yet if there is a sufficient time for the passion to subside, and for reason to interpose, the homicide will be murder. Wadlington v. The State, 19 Texas Ct. App., 275; Whart. Hom., secs. 488, 489.

Appellant contends that the homicide at bar is bailable because committed under the influence of uncontrollable passion arising upon an adequate cause, to-wit, insulting conduct to a female relation. First, it is insisted, that while the relationship did not in fact exist at the time of the outrage, yet that Mrs. Jones, by subsequent marriage, became a relation, because under the permanent protection of appellant, by virtue of Penal Code, article 601, which reads: "That any female under the permanent or temporary protection of the accused at the time of killing shall also be included within the meaning of the term 'relation.'" Secondly, that article 597 is not intended to be exclusive, but is only illustrative of the character of injury that will be deemed an adequate cause at law to reduce homicide to manslaughter. Thirdly, appellant contends, that if not manslaughter, it can only be murder in the second degree; for the nature of the provocation was such as to negative the probability that his mind was at any time calm and deliberate, and in proof that it was not so, refers to his conduct and conversation with Kendall. The State replies, that articles 597 and 601 have no application to the case at bar, and no adequate cause is shown for the homicide, but that, whether there was adequate or inadequate cause, still the threats, preparation, the interval between the provocation and the killing, the absence of all excitement at the time of killing, and the manner of killing, afford evident proof of a formed design in a calm and sedate mind.

Upon the first ground, we hold that article 601 of the Penal Code is to be construed with article 597. That is to say, the insult must be given to the female while under the protection of the slayer, and the killing must also be done while she is under his protection. The difference be-

tween the cases of an actual relation and the statutory relationship of protection is, that while in both cases the insult must be given while the relationship exists, the killing must occur at the first meeting in the case of the actual relative, and in the statutory relationship it must occur during the existence of the relationship; for if the female so insulted leaves the protection of the slayer before the first meeting with the one insulting her occurs, the right to act is gone. The proposition that one has a right to avenge the wrongs of any female he may take under his protection, without regard to the time the injury was done, is without force or merit; for, apart from the disastrous consequences of such a construction, the insult would not, in fact, have been offered to a female relation, which must be shown before the statute can be invoked.

Upon the second ground, we hold that we have no right to extend the purview of section 4, article 597, Penal Code, so as to include others not mentioned. The law might have declared, that insulting words and conduct to any relative should be deemed adequate cause for homicide; but it did not do so; and an insult to any male relative, however feeble, infirm, or loved, can not be regarded as adequate cause, because the statute limits it to female relatives. Again, the statute lays the limitation as to time, and we can not legislate. While public policy recognizes, on the one hand, the frailty of human temper, it also demands that the exceptions to the law of "life for life" should be limited and closely scrutinized.

The law recognizes the uncontrollable power of sudden passion as the cause of homicide, when this sudden passion arises upon a provocation which would commonly or naturally arouse the passion or sudden resentment of a person of ordinary temper to such a degree as to render the mind incapable of cool reflection. It is to be observed that this passion is sudden, uncontrollable, and flaming up from the injury or insult, and the homicide must occur before there is reflection or composure. Our code defines and describes the character of the passion that reduces homicide to manslaughter as " sudden passion." Penal Code, art. 593. No time is allowed, except in the cases mentioned in article 597, for brooding over the wrong or for compassing and preparation; for then the homicide becomes deliberate, premeditated, and malicious, though the provoking cause be an adequate cause.

But the code has, in cases of adultery and of insulting words and conduct to female relatives, extended the time in which homicide, when committed, may still be manslaughter. In such cases the law requires the homicide to occur as soon as the adultery is discovered (Penal Code, article 597), or as soon as the party killing may meet the one giving the insult, after being informed thereof. Penal Code, art. 598. If not done at such times, the injury may become evidence of malice and preparation to kill; evidence of premeditation and deliberation.

But, again, to reduce the homicide to manslaughter, even when ade-

quate cause exists, and the killing takes place at the time required by law, it must also appear that the homicide was a result of a passion that rendered the slayer incapable of cool reflection.   In Breedlove's case, 26 Texas Court of Appeals, 453, where it seems the wrong man was shot, Willson, J., says:  "If defendant had killed King, instead of Amos, shortly after he (defendant) had been informed and was convinced that King had carnal intercourse with his (defendant's) wife, such killing under the facts would have been murder in the first degree.   It could not have been manslaughter, because the evidence shows that in committing the homicide his mind was cool, sedate, and deliberate.   He prepared himself with a weapon, traveled half a mile, secreted himself in a convenient place, and waylaid his victim.   He was not acting under the influence of sudden passion."   Again, in Massie's case, 30 Texas Court of Appeals, 69, where defendant killed deceased for being too intimate with his wife, this court held, that in the absence of passion that reduces murder to manslaughter, the adequate cause may become cogent evidence of malice, and an aggravating circumstance attending the commission of the offense.

2.  But the law made a further concession to human frailty when it divided murder into two degrees.   At common law this distinction did not exist, and murder, whether upon express or implied malice, was punished with death.   But, under our code, a homicide committed in sudden passion, upon an inadequate cause, is murder in the second degree.   That is to say, when a homicide is committed upon a provocation that ought not to have aroused the passion of a person of ordinary temper, yet in fact the slayer was laboring under a passion so strong as to render him incapable of considering the consequences of his act, it is but murder in the second degree.   But it is to be observed it must be the passion that strikes; for if the slayer broods over his injury, and deliberately forms the design to kill, and prepares for it, the presence of passion at the moment of the premeditated homicide can not change its nature.   The law makes no allowance for the passion of revenge.   While it concedes something to the instinctive, unreasoning passion, that blindly strikes, it has no sympathy with the vindictive, calculating spirit, that deliberately premeditates and maliciously acts.

There may be injuries which do not come within the purview of Penal Code, articles 597, 598, yet are so grave that the mind, however long the interval, would not ordinarily dwell calmly and deliberately upon them, and a homicide committed in consequence thereof may not be greater than murder in the second degree.   Yet, even in such cases, if the evidence renders it certain that the mind of defendant was in fact calm and deliberate when the design to kill was formed, or that, when it was executed, it was done in pursuance of a formed design, as manifested by the threats to take life, by the purchase and exhibition of weapons procured for that purpose, said purpose to be consummated whenever the parties

should meet, and at the time of the killing there was no excitement other than that naturally attending such an act, but the same is committed calmly and coolly, or covertly, it is murder upon express malice.

It is not usual or proper to discuss the evidence in the case, and we simply state the law of the case, as it appears of record; and we have reached the conclusion that there is no error in the lower court in refusing bail, and the judgment is affirmed.

*Affirmed.*

Davidson, J., concurs. Hurt, P. J., concurs in the conclusion reached, but not in all the propositions stated.