Albert Jordan v. The State.

No. 1063. Decided March 22, 1911.

Rehearing Denied May 17, 1911.

**1.—Murder—Murder in the First Degree—Charge of Court.**

Where defendant was acquitted of murder in the first degree, it is unnecessary to pass on the court's charge on that degree of murder.

**2.—Same—Charge of Court—Practice on Appeal.**

Where, upon appeal from a conviction of murder in the second degree, no specific defects were pointed out in the court's charge on murder in the second degree, the same could not be reviewed.

**3.—Same—Charge of Court—Manslaughter—Provocation.**

Where, upon trial of murder, the defense showed insulting conduct to a female relative, and the court instructed the jury that the provocation must arise at the time of the commission of the offense, and that the passion must not be the result of a former provocation, but thereafter in his charge gave an appropriate instruction on the question of insulting conduct towards the female relative as adequate cause, and besides submitted the special instructions requested by the defense upon this issue, there was no reversible error, although the first part of the charge would have been error if standing alone.

**4.—Same—Murder in the Second Degree—Charge of Court.**

Where, upon trial of murder, the defense relied upon insulting conduct to female relative, but there was evidence that the defendant had invited the deceased to his house for improper purposes or for improper liberties with his family, etc., and it became a question for the jury to decide as to the condition of appellant's mind at the time of the homicide, the court properly instructed on murder in the second degree.

**5.—Same—Witnesses—Under Rule—Practice.**

Upon trial of murder, where the court permitted the district attorney to talk with his witnesses for the purpose of arranging the order of introducing the State's testimony, while the witnesses were under the rule, there was no error.

**6.—Same—Argument of Counsel.**

Where, upon trial of murder, State's counsel used argument to which the defendant's counsel objected, and the court thereupon promptly stopped counsel

from speaking and instructed the jury to disregard same, and the matter was not of sufficient importance to require reversal, there was no error.

**7.—Same—Charge of Court—Repetition.**
Where, upon trial of murder, the court's charge on manslaughter was full and sufficient, the complaint that it contained repetition was not of such harmful character as to require reversal.

Appeal from the District Court of Caldwell. Tried below before the Hon. L. W. Moore.

Appeal from a conviction of murder in the second degree; penalty, seven years imprisonment in the penitentiary.

The opinion states the case.

*E. B. Coopwood* and *A. B. Storey,* for appellant.—On question of the court's charge on manslaughter and that the provocation must arise at the time of the commission of the offense: Eanes v. State, 10 Texas Crim. App., 421; Tucker v. State, 50 S. W. Rep., 711; Martin v. State, 40 Texas Crim. Rep., 660, 51 S. W. Rep., 912; Stewart v. State, 52 Texas Crim. Rep., 273, 106 S. W. Rep., 685; Redman v. State, 52 Texas Crim. Rep., 591, 108 S. W. Rep., 365; Akin v. State, 119 S. W. Rep., 863.

On question of repetition in court's charge: Irvine v. State, 20 Texas Crim. App., 12; Bunner v. State, 15 S. W. Rep., 321; Fuller v. State, 113 S. W. Rep., 540; Powell v. Messer, 18 Texas, 401; Traylor v. Townsend, 61 Texas, 144; Hays v. Hays, 66 Texas, 606; Kroeger v. Texas & Pac. Ry. Co., 30 Texas Civ. App., 87, 69 S. W. Rep., 809.

*C. E. Lane,* Assistant Attorney-General, for the State.

DAVIDSON, PRESIDING JUDGE.—Appellant was convicted of murder in the second degree, his punishment being assessed at seven years confinement in the penitentiary.

There are several criticisms of the charge, but most of them are in such general language that they can not be considered.

1. The first objection is that the court erred in instructing the jury with reference to murder in the first degree. Inasmuch as appellant was acquitted of murder in the first degree, it is unnecessary to discuss that question.

2. Another ground of the motion for new trial is in the following language: "The court erred in its charge on second degree murder, as the charge given was not the law, was unintelligible and confusing to the jury." This charge is given in the usual stereotyped form, and in view of the fact that no specific defects are pointed out, we think this objection is not well taken.

3. The charge on manslaughter is criticised, because the court instructed the jury that the provocation must arise at the time of the commission of the offense, and that the passion is not the result of a former provocation. If this charge stood alone, under the authorities

it would be clearly reversible, but the court not only gave a charge appropriate to the matter, but gave an additional instruction at the request of appellant, submitting the very matter at issue to the jury pointedly. The cause of the sudden passion was insulting conduct towards a female relative. Appellant was not present at the time of the insulting conduct, but was informed of that fact, and the killing occurred upon the first meeting. The court, in connection with the criticised charge, gave the following: "When it is sought to reduce the homicide to the grade of manslaughter by reason of the existence of such insulting words or conduct, it must appear that the killing took place immediately upon the happening of the insulting conduct or the uttering of the insulting words, or so soon thereafter as the party may meet with the party killed, after having been informed of such insults." The court also, in this connection, instructed the jury that they might take into consideration, and in this connection, all facts and circumstances in evidence, and if by reason of all these matters the mind of defendant was incapable of cool reflection, he would be entitled to be acquitted of murder, and the conviction should be for no higher offense than manslaughter. Again, the court gave this instruction, at the request of appellant:

"If you find from the evidence in this case that the defendant had been informed that the deceased had made improper proposals to his stepdaughters, and had gone to his house in the night-time for an improper purpose, and he believed said report to be true, and that this produced in the mind of the defendant passion, anger, resentment, rage, and that in such frame of mind he shot and killed the deceased at the first meeting after he had been informed of the acts of the deceased, then you are instructed that the defendant would not be guilty of any higher degree of offense than that of manslaughter, although you believe that the information given to the defendant as to the acts or words of the deceased were not true."

We are of opinion that these different charges sufficiently presented the matter so that appellant has no just cause of complaint. In passing on questions of this character, it is a rule, well settled, that the whole charge must be taken into consideration. Had the charge limited the adequate cause, as complained by appellant, and it was left standing alone, then the error would be apparent, but as the matter is presented we are of opinion that we would not be justified in reversing this judgment.

4. Appellant also contends that the facts in the case did not justify the jury in reaching the conclusion that appellant was guilty of murder in the second degree. The evidence seems to indicate, and in fact does show, that up to a day or two before the homicide the parties had been friends, and it would further seem that the cause of trouble between them was the insulting conduct or language used by deceased to appellant's stepdaughters, and a subsequent visit at night to his residence in his absence. There was nothing done at the house further

than a visit by deceased, and a few words of conversation between appellant's wife and deceased, which language did not indicate, by the terms used, any indecency or proposals of that sort, yet there might be a construction placed upon it, in the light of what had previously occurred, that deceased's visit to the house indicated it was for the purpose of having sexual intercourse. Such was the construction placed upon it by appellant, and perhaps even some statements of the deceased during their conversation just preceding the shooting would justify this conclusion. The deceased stated to appellant at the time of the homicide that he had invited him to go to his house, where he could have such improper relation. This was denied, however, by appellant. Upon the occurrence of this latter conversation the shooting occurred instantly.

There are some facts and circumstances upon which the jury could predicate a conviction for murder in the second degree. One of the witnesses, Julia Ellison, testified that appellant came to her house before the homicide and told her he intended to kill the deceased on the following Monday morning, and that she tried to dissuade him from doing so. She says: "Albert told me that he had a talk for me, and I told him he would have to wait until I got through dinner. After I finished dinner we walked out in the yard by ourselves where no one could hear us. He told me that Martin had come to his house, and that he was going to kill him the next morning. I told him not to do it. I asked him, What did Martin do? He said he had done 'nothing; I am going to kill him Monday morning.' I said, 'Don't do that and get yourself into a fuss; let the officers stop him if he has done anything;' and he says, 'Dog gone it, I ain't; I am going to take the law in my own hands.' He told me not to tell Isom. He told me not to tell anybody, and not to tell Isom." Albert is the appellant; Isom was the husband of the witness, and Martin the deceased.

Isom Ellison testified: "After appellant and my wife had got through talking I said, 'Let's go to church,' and the defendant laughed and says, 'You just want to know what we were talking about,' and I says, 'No, sir; I am in no ways particular,' and he says, 'You want to know?' and I says, 'No, sir, she will tell me anyhow;' and he says, 'Will you tell?' and she says, 'I am going to tell some of it.' We were just laughing, all of us in a good humor. Albert appeared to be laughing and in a good humor. Defendant told my wife not to tell me what he had said about Martin."

Sam Ross testified: "On the evening that deceased was killed Sanders Ellison and myself went to Martin Ellison where he was at work in his field, at the request of Albert Ellison, to talk to him, and to find out why deceased had gone to Albert Ellison's house the Saturday night before. We found him chopping cotton, and Sanders called him out to the lane and we talked to him a half hour. In this talk Martin admitted that he had been there at Albert Ellison's house the Saturday night before, but he didn't say what he had gone for, but

that he wasn't after Mary. Sanders Ellison requested deceased to go over and talk to Albert Ellison about the matter, and deceased agreed to meet him at the Jones' pasture corner. Sanders went on home and I went with Martin down to meet Albert. We found Albert near home fixing to go to plowing, and I called him to come to where we were. Albert replied, 'You come here,' and then Martin told him to come to where we were, and Albert come up to us. When Albert come up he said 'Good evening,' and Martin answered, 'Good evening.' Martin then said, 'Albert, didn't you tell me that there was plenty down there for me?' Albert then asked him if he meant his, Albert's house, and Martin replied, 'Yes, your house.' A dispute then followed over this statement ending in both drawing pistols. I thought Martin drew his pistol out first, and I think fired first. Both shots, however, were very close together, and I can't swear that Martin fired the first shot. I think three shots were fired."

Sanders Ellison testified: "On Sunday before this I had seen the defendant at church, and he stated to me that he wanted me and Isom Ellison to see Martin for him about coming to his house on Saturday night. I told him that I was going over to Sam's next day after some corn and I would see Martin then. When I passed his house the next morning Albert came out to the road and asked me where Isom was, and I told him he was at home—that he was not coming. He said, 'Let's go and bring Martin here,' and I said, 'No.' He then asked and tried to get me to go and bring Martin over to see him, and I told him 'No,' and then he says, 'Let me go with you up to Martin's,' and I told him 'No' again, and he says, 'Why?' and I says, 'Because you are mad.' He then said that he was going, and I told him 'All right,' but I was not going with him." Here the defendant and this witness separated. This witness went to Sam Ross' after some corn, and on his return from Ross' before dinner time, and as he passed appellant's house, appellant came out again, and his wife was with him. He suggested that he wanted to see what business Martin had at his house when he was gone. "I asked him what he had done, and if he had done anything except come to his house, and he said, 'You go up there and see what he says.' About this time I told him that Sam Ross was hitching up his mules to go to town to send some money to his girl at Austin, and maybe he could get Sam to go over to Martin's with him." This is a sufficient statement of the evidence in regard to the reason for the killing. While it may be, so far as this record is concerned, that the cause of the killing grew out of the conduct of deceased as already stated, yet there is room, we think, for the jury to have arrived at the conclusion that appellant's mind was not in such condition that rendered it incapable of cool reflection; at least, we are of opinion, from these facts, that it was a question for the jury to decide as to the condition of appellant's mind at the time of the homicide. These facts, we think, justified the court in charging on murder in the second degree.

and we do not feel that we would be authorized to disturb the finding of the jury when the killing occurred under such circumstances.

5. The rule was invoked, and after this was done the district attorney was permitted to take the witnesses in his office and have them relate to him in the presence of each other what they would swear. This was done with permission of the court. The court signs the bill with this statement: "After the defendant had been arraigned and the indictment read to the jury, the district attorney asked for ten minutes time in which to arrange the order of the State's testimony, which was granted. Immediately thereafter the State announced ready to proceed with the trial of the cause, when all witnesses were duly sworn and placed under the rule and the trial proceeded." We are of opinion there is no error shown in this matter. There is nothing to indicate appellant suffered any injury by it in any manner. The rule was not violated in any way. The district attorney talked with the witnesses with the consent of the court for a few moments, as he said, for the purpose of arranging the order of introducing the State's testimony. This, we think, was not improper.

6. There is an objection urged to some remarks made by one of State's counsel. The language quoted in the bill is as follows: "The defendant has heard white men talking about resorting to the higher law in the protection of the virtue of their families against insults, and he comes here, a black negro, the exact image of Jack Johnson, and thinks he can fool this jury into turning him loose on the grounds that he was protecting his mulatto stepdaughter, who came on the stand and tried to talk like a Yankee." Objection was interposed at this point, and the court remarked: "The counsel will confine his remarks to the records in this case." The counsel then remarked, in the presence of the jury: "Gentlemen of the jury, Mr. Storey objects to my stating that the defendant resembles Jack Johnson; I wish to say that I guess I am wrong about it, as Mr. Storey is a better judge as to whether the defendant favors him or not." This bill of exceptions is signed with this qualification: "The attorney, J. E. Pearce, did refer to the defendant as the personification of Jack Johnson, but the interested parties in this case were all negroes. When said remarks were objected to by counsel for defendant the court promptly stopped counsel from speaking, and instructed the jury to disregard same, and that counsel should confine himself to the record in the case." We are of opinion that this matter, as presented by the bill as qualified, is not of sufficient importance to require a reversal of the judgment.

We are of opinion that the record does not present any error of a sufficient nature to require a reversal; therefore the judgment is affirmed.

*Affirmed.*

### ON REHEARING.

#### May 17, 1911.

DAVIDSON, Presiding Judge.—At a former day of the term the judgment herein was affirmed. Appellant has filed rather an elaborate motion for rehearing, and ably and strongly presents reasons why the court was in error in affirming the judgment.

We have given the case a careful rehearing in the light of the brief and authorities filed in connection with the motion.

1. Appellant insists that the evidence does not justify the verdict of the jury in assessing a penalty for murder in the second degree. We can not agree with counsel in this matter. We think the evidence does warrant the jury in arriving at their verdict. Where there is evidence upon which the jury can have its finding for murder in the second degree, where the question of manslaughter is also prominent, this court could not feel justified in reversing the case. It is a question under the statute for the jury to decide whether the homicide was produced by reason of adequate cause or for some other reason. It may sometimes occur, and doubtless will, that there is no other reason assigned than adequate cause for the killing. Even where that is the case, if the mind of the slayer is not rendered incapable of cool reflection, required by law, it would not necessarily be reduced to manslaughter. It might be murder in the first degree. If the party doing the slaying was not actuated by passion, but it was the result of deliberate preparation, as lying in wait to wreak his vengeance, or if the evidence showed premeditation and cool deliberation, the cause relied upon as adequate might be evidence of malice. In addition to what was said in the original opinion, it may be well enough to state that deceased claimed that he was invited by appellant to go to his house for the purpose of having intercourse with some female member of the family; that he was informed that he could gratify such desires by going to his house. Not only so, but when appellant and deceased met at the time of the fatal difficulty, the question came up between them, and deceased then charged appellant to his face that he had invited him to go there for that purpose. If deceased in fact insulted the female relative of appellant by going to his house, this may or may not have been adequate cause for sudden passion on the part of appellant. If appellant had invited him to go there for that purpose, and the deceased had gone, the fact that it would be insulting conduct towards a female relative would not necessarily reduce the homicide to manslaughter on the part of appellant in killing for the reason he had invited him to go. He had induced the deceased to do what was done. This might constitute evidence of malice and preparation on his part, and put deceased in such attitude that he might kill him on account of such insulting conduct. As stated in the original opinion also, appellant had also talked to two witnesses, whose testimony is mentioned, to the effect that he was going to kill deceased Monday morn-

ing, at which time he was in a good humor and cool. We do not deem it necessary to go further into the facts to indicate the jury were justified in finding appellant guilty of murder in the second degree instead of manslaughter. There is evidence which justifies that conclusion.

2. Appellant contends that the charge on manslaughter is not sufficient, and is misleading, in that it did not sufficiently present the theory of manslaughter, that appellant had a right to kill under that phase of the law upon the first meeting after he was informed of the insulting conduct, and that the court was in error in not definitely stating to the jury that he would have a right to kill upon the first meeting. To this contention we can not accede. The court charged the jury that insulting conduct towards a female relative would constitute adequate cause, and if the mind was angered or enraged to such an extent that it was incapable of cool reflection, although the law requires that the provocation arise at the time of the killing, yet it was the duty of the jury in determining the adequacy of the provocation to consider in connection therewith all the facts and circumstances, and if by reason thereof defendant's mind at the time of the killing was incapable of cool reflection, they would convict him of no higher offense than manslaughter. Then the court further charged the jury that insulting words or conduct of the party killed towards a female relation of the party guilty of the homicide constitutes adequate cause; and when it is sought to reduce the homicide to the grade of manslaughter for this reason, it must appear that the killing took place immediately upon the happening of the insulting conduct, or the uttering of the insulting words, or so soon thereafter as the party killing may meet with the party killed, after having been informed of such insults.

In addition to all that, the court charged, at the request of appellant, as follows:

"If you find from the testimony in this case that the defendant had been informed that the deceased had made improper proposals to his stepdaughters, and had gone to his house in the night-time for an improper purpose, and he believed said report to be true, and that this produced in the mind of the defendant passion, anger, resentment, rage, and that in such frame of mind he shot and killed the deceased at the first meeting after he had been informed of the acts of the deceased, then you are instructed that the defendant would not be guilty of any higher degree of offense than that of manslaughter, although you may believe that the information given to the defendant as to the acts or words of the deceased were not true."

The court also charged the jury, at the request of appellant, as follows:

"If you find from the testimony in this case that the defendant was informed that the deceased had been to the defendant's house in the night-time in his absence, and that the defendant desired to interview

the deceased and get an explanation from him of his actions, in going to his house under the circumstances, and that before he went to see the deceased the defendant armed himself, you are instructed that the fact of the defendant arming himself would not, in law, deprive the defendant of the right of defending himself against any unlawful attack, if any, made upon him by the deceased."

The appellant's first charge, as given, supplementary to the charge given by the court, presented the very facts themselves to the jury upon which appellant predicated his adequate cause. We are referred to Akin's case, 56 Texas Crim. Rep., 324, as authority for reversing this case. We do not understand the Akin case to be in point. The charge in this case meets the very question upon which the Akin case was reversed. The first charge given in this case by the court in regard to the general circumstances and combination of facts which might engender passion is practically the same as the charge given in Akin's case, but the Akin case was reversed because practically the same charge given at request of appellant in this case was not given to the jury in that case.

3. The court gave charges with reference to adequate cause separately; that is, he first gave a charge with regard to a combination of facts and circumstances, and in a subsequent portion of the charge gave that with reference to insulting conduct. The court saw proper in submitting each ground of adequate cause, to tell the jury in that connection that the adequate cause must exist and the passion must be engendered by it. Usually we find this charge given, not separately, as in this case, and the charge with reference to adequacy and consequent passion, given in connection with the whole charge in regard to manslaughter. We have had occasion to criticise the repetition of charges that had a tendency, or that may have had the effect, to convey to the jury the idea that the court did or did not believe certain facts, and in some instances had occasion to reverse because of the repetition of these charges, but as this case is presented we do not believe that we would be justified in reversing the judgment for the reasons urged. If this be considered as repetition, it was so given as not to be harmful.

We are of opinion that the motion for rehearing should be overruled, and that it presents nothing of sufficient importance to require us to recede from the affirmance. The motion for rehearing is overruled.

*Overruled.*