LAWRENCE JAYNES V. THE STATE.

No. 1502. Decided April 10, 1912.

Rehearing denied June 26, 1912.

**1.—Murder—Manslaughter—Charge of Court—Sudden Passion—Statutes Construed.**

In accordance with the rule laid down by the statutes and decisions, two clear requisites are necessary to constitute manslaughter: First, sudden passion, and second, that sudden passion must arise from an adequate cause, and in order to reduce murder in the second degree to manslaughter, the homicide must be committed under the immediate influence of sudden passion arising from an adequate cause. Following Puryear v. State, 56 Texas Crim. Rep., 231.

**2.—Same—Statutes—Decisions.**

Although there may be some more or less loose expression in some of the decisions which may, perhaps, sustain appellant's contention as to adequate cause, this court will not follow them on this subject where they conflict with the express and specific statement of the statute as to what it takes to constitute manslaughter. Following Leeper v. State, 29 Texas Crim. App., 63.

**3.—Same—Manslaughter—Charge of Court—Sudden Passion.**

Where, upon trial of murder, defendant's evidence showed insulting words and conduct by the deceased towards defendant's daughter, there was no error in the court's charge in giving the very definition of manslaughter as it is contained in Article 1128, Revised Penal Code, and instructing the jury among other things that manslaughter is voluntary homicide committed

under the immediate influence of sudden passion arising from an adequate cause, etc., and the contention of appellant that because of the use in the court's charge of the word "sudden" is reversible error is untenable, and there was no error.

### 4.—Same—Charge of Court—Manslaughter.

Where, upon trial of murder, the defendant claimed among his defenses insulting words and conduct towards a female relative, and the evidence showed that such conduct by the deceased was communicated to the defendant about an hour before the killing which took place upon the first meeting of the parties, the jury could not have been misled by the court's charge in using the word, "sudden passion" in defining adequate cause. Davidson, Presiding Judge, dissenting.

### 5.—Same—Charge of Court—Time of Provocation.

Where, upon trial of murder, defendant interposed as a defense the issue of insulting conduct to a female relative, there was no error in the court's charge under the facts, which disclosed a former provocation, that the provocation must have occurred at the time of the homicide, the evidence showing that the communication of such insulting conduct occurred about an hour before the killing on the first meeting of the parties, and the former provocation long before. Davidson, Presiding Judge, dissenting.

### 6.—Same—Statutes Construed—Former Provocation—Adequate Cause.

The first subdivision of article 1129, Revised Penal Code, which defines what is meant by the expression, "under the immediate influence of sudden passion," and that the provocation must arise at the time of the commission of the offense, and that the passion is not the result of a former provocation is still the law, and the court must follow same even though there may be some loose or general contrary expressions in former decisions of this court on the subject. Distinguishing Akin v. State, 56 Texas Crim. Rep., 324; Tucker v. State, 50 S. W. Rep., 711. Davidson, Presiding Judge, dissenting.

### 7.—Same—Charge of Court—New Provocation.

Where, upon trial of murder, the defendant interposed the issue of insulting conduct to a female relative, and also claimed a new provocation at the very time of the killing, but it appeared from the evidence that the alleged verbal insult by deceased was directed towards defendant, there was no error in the court's failure to charge on such alleged new provocation;. besides, the charge of the court in general terms embraced this alleged insult, in instructing the jury that they must consider all the facts and circumstances in evidence.

### 8.—Same—Charge of Court—Words and Phrases—Invited Error.

Where the court's charge used the words, "honestly believe," in his charge on manslaughter, but did not use said words in that clause of the charge wherein the question was submitted to the jury for its finding, and it also appeared that the defendant invited said error, if error, there was no reversible error.

### 9.—Same—Charge of Court—Manslaughter—Self-Defense.

Where, upon trial of murder, the defendant complained that the court's charge did not separately and distinctly submit adequate cause, as to the alleged hostile demonstration by the deceased at the time of the killing, which showed that deceased put his hand in his bosom apparently to draw a pistol, when defendant fired. Held, that the same did not raise such issue, and it was not necessary to submit the same in the court's charge on manslaughter, and the defendant could only avail himself thereof on the issue of self-defense, which the court properly submitted.

### 10.—Same—Charge of Court—Manslaughter—Self-Defense.

Where, upon trial of murder, the issues of manslaughter and self-defense were raised by the evidence and properly submitted by the court, there was no error in the court's charge on manslaughter to say that if defendant did

not act in defense of himself against an unlawful attack, etc., to find the defendant guilty of manslaughter.

### 11.—Same—Charge of Court—Self-Defense—Actual Attack.

Where, upon trial of murder, the evidence for the defense showed that deceased put his hand in his bosom as though he was going to draw his pistol just before defendant fired and killed him, there was no error in the court's charge to instruct the jury to acquit defendant if they believed that defendant killed deceased at the time deceased had made or was making an attack on him which caused him to have reasonable expectation or fear of death or serious bodily injury, and that deceased was armed at the time and defendant so honestly believed, and there was no error in the court's failure to charge on apparent danger. Davidson, Presiding Judge, dissenting.

### 12.—Same—Objections to Charge of Court—Practice on Appeal.

While article 723, Code Criminal Procedure, does not change the rule that objections to a charge of the court may be made in the motion for new trial, yet this court has at no time looked with so much favor upon objections to a charge when first presented in the motion for new trial that it has when exceptions were made to the charge at the time it was given, or special charges were requested; and where no error appears of record which is calculated to injure the rights of the defendant, and it appears from the record that the first objection to the court's charge is made in a motion for new trial, there is no reversible error. Davidson, Presiding Judge, dissenting.

### 13.—Same—Actual and Apparent Danger.

Where, upon trial of murder, the evidence showed on the part of the defense that at the time defendant shot deceased the latter put his hand in his bosom as though he was going to draw his pistol, there was no error in the court's charge that if the jury believed that at the time defendant killed deceased the latter had made or was making an attack on the former, to acquit, and there was no error in the court's failure to charge on apparent danger, as the court's charge was more favorable to the defendant under the facts than the law required; especially, where no charge was requested covering any of the points complained of in defendant's motion for new trial.

### 14.—Same—Argument of Counsel.

Where, upon trial of murder, the argument of the district attorney to which the defendant objected, was induced by the defendant's argument which the State's counsel answered, there was no error.

### 15.—Same—Evidence—Contradicting Witness—Rebuttal.

Where, upon trial of murder, the defendant claimed that deceased had enticed defendant's daughter from the latter's home for immoral purposes and introduced witnesses tending to show this, there was no error in permitting the State in rebuttal to show that the defendant's claim was not well founded, and that other men had enticed away defendant's daughter and were seen with her during the time defendant claimed she was in company of deceased.

### 16.—Same—Charge of Court—Practice on Appeal—Precedent.

In passing on the charge of the court in any case the whole of it must be considered, and it must also be considered in connection with the testimony, and this rule applies in determining the application of a previous decision of the court which is cited to sustain a given proposition, besides, statutory provisions can not be changed by the decision of any case.

### 17.—Same—Manslaughter—Statutes Construed.

Article 1133, Revised Penal Code, does not change or repeal articles 1128, 1129, and 1132 of the Revised Penal Code, and does not do away with sudden passion as one of the necessary elements of manslaughter when the killing is claimed to have occurred because of the insulting words or conduct of the person killed towards a female relation of the party killing, nor does it change the definition of what is meant by "under the immediate

influence of sudden passion," and that the provocation must arise at the time of the commission of the offense and is not the result of a former provocation.

### 18.—Same—Statutes Construed—Manslaughter.

The whole of the specific language used in article 1133, Revised Penal Code, must be taken into consideration and when doing so in connection with the whole statute on manslaughter it repels the idea that the slayer can nurse his wrath from year to year or month to month, or week to week, or even day to day, and then claim that because he did not meet the insulting party after such lapse of time and then killed him he is guilty of manslaughter only, but the killing must take place within some reasonably short time or immediately after the insulting words or conduct are communicated to the slayer.

### 19.—Same—Case Stated—Manslaughter—Insulting Conduct to Female Relative—Sudden Passion.

Where, upon trial of murder, the evidence showed that the defendant acted within such a short period of time, after being informed of the claimed insulting conduct, as to show that if the adequate cause was what aroused his passion it was within so short a time after he heard it as to make such a passion sudden and that it was aroused at the time of the commission of the offense, there was no error in the court's charge that the passion must be sudden and must not have been aroused by a former provocation; there being evidence of a former provocation.    Davidson, Presiding Judge, dissenting.

Appeal from the Criminal District Court of Harris.    Tried below before the Hon. C. W. Robinson.

Appeal from a conviction of murder in the second degree; penalty, seven years imprisonment in the penitentiary.

The opinion states the case.

*Brockman, Kahn & Williams,* for appellant.—Appellant made the following complaint to said charge: First, that it required the jury to find that the defendant was laboring under sudden passion at the time of the homicide, and thereby deprived him of any benefit that the law would give him if the jury believed that the insult to his minor daughter was the cause of the killing.

Second.    Because in connection with this error, and giving emphasis to it, the court further instructed the jury that the provocation must arise at the time of the commission of the offense, and that the passion must not be the result of a former provocation, thus depriving the defendant of the benefit of the law applicable to the evidence of a former insult to his female relative.

The Acts of 1858 were in the nature of amendments, and by their plain import, where the killing resulted from insulting words or conduct towards a female relation, if it occurred at the first meeting between the parties, it was the intention of the Legislature to so change the law as to nullify that portion of article 698, which required the killing to be committed under the immediate influence of "sudden passion," and to further change the original article on manslaughter so as to nullify section 1, of article 699, that requires "that the provocation must arise at the time of the commission of the of-

fense, and that the passion is not the result of a former provocation." The conflict is irreconcilable. The correct rule of interpretation of such statutes, is laid down in 26 Am. & Eng. Ency. of Law, page 708.

So applying this rule of construction and interpretation, our courts have construed the amendment of 1858 to render inapplicable subdivision 1 of article 699, only in such cases where the testimony shows the killing to have been done on the first meeting after the person killed and offered insulting conduct or insulting words towards a female relation of the party killing, and in all cases where the cause producing the passion was other than that of insulting words or conduct towards a female relation, the courts have permitted said article to stand and have its full force and weight. But, as stated above, where the fourth subdivision of article 699 is relied on, then that portion of the original law which conflicts with article 703 has been held by the court to be inapplicable and void.

This testimony presented manslaughter under three different theories, to wit:

(1) A killing based upon insulting conduct towards a female relative at the first meeting of the defendant with the deceased after the same had been communicated to him.

(2) A killing based upon a fresh insult in the nature of an admission made at the time of the killing by the deceased when accosted by the defendant with reference to insulting conduct towards a female relative.

(3) That in connection with the two preceding theories and in connection with a previous threat to "fix defendant," the deceased, on being asked for an explanation, or for information, made a hostile demonstration as though to draw a weapon, and that the defendant acted with undue haste or precipitation against such demonstration. Whaley v. State, 9 Texas Crim. App., 305; Eanes v. State, 10 id., 421; Niland v. State, 19 id., 166; Orman v. State, 22 id., 604; Williams v. State, 24 id., 637; Norman v. State, 26 id., 221; Jones v. State, 33 Texas Crim. Rep., 492; Martin v. State, 40 id., 660; Bays v. State, 50 id., 548; Tucker v. State, 50 S. W. Rep., 711; Stewart v. State, 52 Texas Crim. Rep., 273; Gillespie v. State, 53 id., 167; Akin v. State, 56 id., 324; Wharton on Law of Homicide, 3d par., 174, p. 279; Paulin v. State, 21 Texas Crim. App., 436; Maxwell v. State, 56 S. W. Rep., 62; Attaway v. State, 41 Texas Crim. Rep., 395; Melton v. State, 47 id., 451.

Upon question of court's charge on self-defense: Phipps v. State, 34 Texas Crim. Rep., 560; Poole v. State, 45 id., 348; Benson v. State, 51 id., 367; Watson v. State, 50 id., 171; Cochran v. State, 28 Texas Crim. App., 422.

Upon question of admitting testimony to contradict the testimony of the witnesses Ada King, Terrell Bates and Burrell Ohrer with reference to whereabouts of defendant's daughter: Young v. State, 59 Texas Crim. Rep., 137, 127 S. W. Rep., 1058.

*C. E. Lane,* Assistant Attorney-General, and *Richard G. Maury,* District Attorney, for the State.—The theory of the law is that the insulting conduct of the deceased towards the female relative so outraged the defendant that upon his first meeting he would naturally be seized with a sudden transport of passion. The law only says that the cause stated shall have what effect? This effect and this effect only: that the adequate cause will justify the sudden transport of passion which the law presumes to be based upon adequate cause. Chatman v. State, 55 S. W. Rep., 346; Knowles v. State, 31 Texas Crim. Rep., 383, and cases cited in opinion.

PRENDERGAST, Judge.—The appellant was convicted of murder in the second degree and his penalty fixed at seven years in the penitentiary.

The appellant and deceased lived on the same block and on the same side of the block, two houses intervening between them. They had so lived for a few years prior to the killing. The deceased in going to town and to and from the street car had to pass along the sidewalk from his residence in front of appellant's residence and had been in the habit of doing this practically continuously for these years. The appellant at the time of the killing and for many years before had continuously been in the employ of one of the railroads as lumber inspector. The deceased was a carpenter and had been for some time. At the time of the killing and for some weeks prior thereto he was the contractor on a certain building some two or three blocks from his residence beyond appellant and had, himself, during this time, not only been the contractor for the building, but had actively worked from day to day as a hand thereon. He went to this job every morning, work days, to his home at noon for his dinner, went back to the job just before or about 1 o'clock each of said days and then returned to his home after 5 o'clock and before night during all of these weeks, and in thus passing back and forth he passed along the sidewalk, both going and returning to his home, in front of appellant's residence.

One theory of the State was, as we gather from the record, that the appellant had become outraged and insulted at deceased because of his acts and conduct which appellant and his wife claimed had been kept up for a long time, as deceased passed back and forth in front of appellant's residence. The front of appellant's house was about fifteen feet from the sidewalk. On a part of the side of the house towards the street appellant had a gallery four or five feet wide, extending about the length of an ordinary room. One room of his residence between this gallery and deceased's residence projected towards the sidewalk beyond the edge of this gallery, so that one on this gallery at the entrance of the door from it into the room, because of this projecting room, could not see anyone coming from towards deceased's residence passing appellant's until after such person reached

a point practically immediately in front of this door of appellant's
residence. The State introduced proof showing that appellant could
have seen and probably did see the deceased as he was returning from
his work the day of the killing to his home for dinner, just after 12
o'clock noon, and by reason of his continuously passing back from
dinner to his work appellant knew that he would return about or
just before 1 o'clock and pass again in front of his residence; that
during the interval from the time the deceased passed appellant's
house going to his dinner and his return, going back to his work
just before 1 o'clock, the appellant had prepared and placed his
double-barrel shotgun loaded with buckshot just inside of this door,
leaning it against the wall and had kept watch for the return of
deceased, and just as he got past this projecting room, walking along
on the sidewalk in front of appellant's residence, in company with
deceased's brother and followed by him, just a few feet behind him,
appellant called out to deceased, "You damned son-of-a-bitch, I am
going to kill you," then quickly reached for, got his double-barrel
shotgun and almost instantly fired and killed deceased; that deceased
said and did nothing whatever at the time and had no time to reply
to appellant's announcement that he was going to kill him, the shot
taking effect in the left arm and left breast of deceased, the physical
facts thus showing that the deceased had his left side to appellant,
which he naturally did in passing along the sidewalk in front of
appellant's residence as he had to do, and that the appellant's an-
nouncement to him merely caused him to partially turn his body
towards appellant as he was killed. The testimony of the State fur-
ther shows that the deceased never halted, continued to walk in the
same direction and that he made no demonstrations whatever towards
appellant and was wholly unarmed.

It was clearly shown that just one week before the killing the ap-
pellant's daughter, his youngest child, between fourteen and fifteen
years of age, had left his residence without his consent with a girl
companion just about a year older than she, and that, although he
and his family had hunted for her they had been unable to locate
her, and that just about within an hour before the killing a married
daughter of appellant, but who did not testify, who lived in a dif-
ferent part of the city of Houston, had informed him that just two
days before the killing she had met deceased at some point in the
city and had a conversation with the deceased about the absent daugh-
ter, wherein he had inquired of this married daughter if they had
found the young absent daughter, whose name was Amelia, and upon
her telling him that they had not and her asking him if he knew
anything about where she was, deceased replied that he had appellant's
daughter where he would never see her again, and that this married
daughter had told appellant this just within about an hour before
the killing, and further told him that she thought deceased had some-
thing to do with getting Amelia away from him, and that deceased

told her to tell "that damned gray-haired old daddy of yours if he wants to know anything from me to come and see me and not send a woman;" that his wife also told him on this same occasion within about an hour before the killing that a Mrs. Schuble had told her never to allow Amelia to go out anywhere by herself, and that she would not let Amelia go anywhere near deceased. It was not disclosed by appellant's wife or otherwise in her testimony when or the occasion for Mrs. Schuble telling her any such thing. That these matters so communicated to him at that time by his wife and married daughter had so affected him that he went all to pieces and really did not know what he was doing, and that it so affected him he walked about during all the time from the time it was told him until he killed deceased as he was passing, and that he had for some little time before deceased was passing on this occasion tried to make up his mind to go to deceased's house and ask him about it, but before he could make up his mind to do so he saw the deceased passing and that he said to him as he was passing: "Hold on there, Mr. Barron; I understand you have my little girl where I will never see her again; you must tell me where she is," and that the deceased stopped, turned and faced him and replied: "What in the hell are you going to do about it?" And that the deceased ran his hand in his bosom, and he, appellant, did not lose any time in getting his gun and then shot and killed the deceased.

The court charged on murder in the first and second degrees, manslaughter and self-defense. No complaint whatever is made to the charge of the court on murder in either degree, but appellant does complain of the charge of the court on manslaughter and self-defense.

We will first take up the complaints of the charge of the court on manslaughter. By this charge the court quoted literally and successively articles 1128, 1129 and 1130, Code Criminal Procedure (new), and then in compliance with other provisions of the manslaughter statute said:

"The following are deemed adequate causes: Insulting words or conduct of the person killed toward a female relation of the party guilty of the homicide, but in order to reduce the homicide to the grade of manslaughter by reason of insulting words or conduct of the person killed toward a female relative of the party guilty of the homicide it must appear that the killing took place immediately upon the happening of the insulting conduct or the uttering of the insulting words, or so soon thereafter as the party killing may meet with the party killed after having been informed of such insult or insults. And I further instruct you that if the defendant in this case was informed and believed that the deceased, Earl Barron, used insulting words or conduct towards his daughter, Amelia Jaynes, and so believing killed the said Earl Barron when he first met him after receiving the information or after being informed of such insult or

insults it would be adequate cause as that term has been hereinbefore and hereinafter explained to you.

"I further instruct you that if you find from the evidence that the deceased, Earl Barron, had caused the defendant's child to leave the protection of its parents' home for the purpose of having illicit intercourse with him, or that the defendant was informed and believed that the said Earl Barron had enticed his child from his home for said purpose and that the defendant killed the said Barron upon the first meeting after he had been informed of such fact, the same would be adequate cause as that term has been hereinbefore and will be hereinafter explained to you.

"And I further instruct you that if you find from the evidence that the deceased, Earl Barron, had caused the defendant's child to leave the protection of its parents' home or was instrumental in keeping her away from her home or that he had her hid out and in any manner prevented her parents from finding her, or if you believe from the evidence that the defendant had been informed and honestly believed that the said Earl Barron had caused the defendant's child to leave the protection of its parents' home or was instrumental in keeping her away from her home, or that he had her hid out and in any manner prevented her parents from finding her and that the defendant upon the first meeting with the said Earl Barron after having been informed thereof (if he was informed) it is adequate cause as that term has been hereinbefore and hereinafter explained to you. And you are further instructed that any of the matters herein mentioned would be adequate cause whether the facts thereof existed or not, provided you believe that the defendant had been informed that such was a fact and that he believed it to be a fact.

"In order to reduce a voluntary homicide to the grade of manslaughter, it is necessary not only that adequate cause existed to produce the state of mind referred to, that is, of anger, rage, sudden resentment or terror, sufficient to render it incapable of cool reflection, but also that such state of mind did actually exist at the time of the commission of the offense, and that it was produced by such adequate cause.

"Although the law provides that the provocation causing the sudden passion must arise at the time of the killing, it is your duty in determining the adequacy of the provocation (if any) to consider in connection therewith all the facts and circumstances in evidence in the case, and if you find that, by reason thereof, the defendant's mind at the time of the killing was incapable of cool reflection, and that said facts and circumstances were sufficient to produce such state of mind, in a person of ordinary temper, then the proof as to the sufficiency of the provocation satisfies the requirements of the law, and so in this case you will consider all the facts and circumstances in determining the condition of the defendant's mind at the time of the

alleged killing and the adequacy of the cause (if any) producing such condition.

"If you believe from the evidence, beyond a reasonable doubt, that the defendant, with a deadly weapon, in a sudden passion arising from an adequate cause, as the same has been hereinbefore explained, and not in .defense of himself against an unlawful attack producing a reasonable expectation or fear of death or serious bodily injury did, in the county of Harris and State of Texas, on or about the 1st day of January, 1910, as alleged shoot and thereby kill Earl Barron, the deceased, as charged in the indictment, you will find the defendant guilty of manslaughter, and assess his punishment at confinement in the State penitentiary for any term of not less than two nor more than five years."

In a subsequent paragraph of the charge the court tells the jury to give the appellant the benefit of the doubt between the different grades of homicide—murder in the first and second degrees and manslaughter.

Appellant contends that the court erred in giving the very definition of manslaughter as it is in said article 1128, Penal Code, because of the use therein of the word "sudden," claiming that if the homicide was on the first meeting after the insult had been communicated to appellant, it is not required that the passion be sudden, and said charge deprived him of any benefit that the law would give him if the jury believed that the insult to his minor daughter was the cause of the killing and that the homicide was on the first meeting, claiming that if this word "sudden" had not been used the jury *"might* have found" that this was the real cause and status of the homicide and they *"might* not have believed" the evidence of the fresh provocation occurring at the time of the homicide. He also contends that by the use of the word "sudden" it eliminated from the consideration of the jury the former provocation as adequate cause.

To sustain his contention he cites us to Orman v. State, 22 Texas Crim. App., 604; Stewart v. State, 52 Texas Crim. Rep., 273, and Gillespie v. State, 53 Texas Crim. Rep., 167. The Orman case holds the reverse, in effect, of appellant's contention. Judge Hurt, as his individual opinion in that case, supports appellant's contention, but he expressly states therein that the court does not agree with him. The other two cases cited seem to rely for support on what Judge Hurt says in the Orman case, and wherein he stated that the court in that case did not agree with him.

The Legislature and it alone had the power. and authority to prescribe the necessary requisites of the crime of manslaughter. This court has no legal power or authority to do so, nor to change them. Notwithstanding there may be some more or less loose expressions in some of the opinions of this court, and perhaps some of them directly sustaining appellant's contention, we will not follow them on this subject, but instead will follow the express and specific statement of

what it takes to constitute manslaughter as the Legislature has prescribed it in the Code.

This court, through Judge Willson in Leeper v. State, 29 Texas Crim. App., 63, in 1890, said: "In this State for more than thirty years we have had a Penal Code and a Code of Criminal Procedure, which having been carefully prepared by distinguished, experienced and able jurists were adopted by the Legislature. These codes have been pronounced by the bench and bar of our State to be the most perfect system of criminal laws ever devised. It is declared to be the design of the Penal Code 'to define in plain language every offense against the laws of this State and affix to each offense its proper punishment.' Penal Code, article 1. It is declared that the Code of Criminal Procedure 'is intended to embrace the rules applicable to the prevention and prosecution of offenses against the laws of this State, and to make rules of proceeding in respect to the prevention and punishment of offenses intelligible to the officers who are to act under them, and to all persons whose rights are to be affected by them.' Code Criminal Procedure, article 1.

"We regard it as the imperative duty of this court, and of all other courts of this State, in the trial and determination of causes, to be guided and controlled by the statutes of the State, whenever there is a statute applicable to the question presented. Our observation is that many errors have crept into the decisions of the courts of this State, especially in criminal cases, by following common law rules and decisions of other States, overlooking our own statutes. These errors should be corrected whenever detected, and a strict adherence to statutes should be the rule governing courts in their decisions."

Our Codes require: "This Code, and every other law upon the subject of crime which may be enacted, shall be construed according to the plain import of the language in which it is written, without regard to the distinction usually made between the construction of penal laws and laws upon other subjects. . . ." (Penal Code, article 9.)

"The provisions of this Code shall be liberally construed, so as to attain the objects intended by the Legislature: The prevention, suppression and punishment of crime." (Code Criminal Procedure, article 25 (new).)

There are many decisions of this court—unnecessary to cite them —which follows this statute and which unequivocally lay down the rule that in accordance with the statute two clear requisites are necessary to constitute manslaughter: First, "sudden passion," and, second, that that "sudden passion" must arise from an "adequate cause." And that in order to change an unlawful homicide from at least murder in the second degree to manslaughter, such homicide must be "committed under the immediate influence of sudden passion" and that that "sudden passion" must arise "from an adequate cause." If either of these requisites are wanting then the homicide can not be

manslaughter, but must be murder in the second degree at least. (Puryear v. State, 56 Texas Crim. Rep., 231.)    However "sudden" the passion, or whenever it was aroused, if the evidence does not show that it was from an "adequate cause," the homicide can not be manslaughter.    And whatever the "adequate cause," if the homicide was not committed "under the immediate influence of *sudden* passion," it can not, under the statute, be manslaughter.  See McKinney v. State, 8 Texas Crim. App., 626; Jones v. State, 31 Texas Crim. Rep., 422; Massey v. State, 30 Texas Crim. App., 64; Blackwell v. State, 29 Texas Crim. App., 194; Miller v. State, 31 Texas Crim. Rep., 609; Clore v. State, 26 Texas Crim. App., 624; Hill v. State, 11 Texas Crim. App., 456; Neyland v. State, 13 Texas Crim. App., 536; Childers v. State, 33 Texas Crim. Rep., 509; Pickens v. State, 31 Texas Crim. Rep., 554; Breedlove v. State, 26 Texas Crim. App., 453; Jordan v. State, 62 Texas Crim. Rep., 380, 137 S. W. Rep., 133; Oldham v. State, recently decided but not yet reported; Alexander v. State, 63 Texas Crim. Rep., 102, 138 S. W. Rep., 721.

Besides this, the jury could not have been misled under the state of proof in this case by the use of "sudden" or stating that the passion aroused which caused the killing must have been "sudden," because if there were statements made to appellant according to all the testimony they were made within about less than an hour before the killing, and the theory of the law is that after such insulting words or conduct is communicated the first sight of such person will arouse sudden passion.  And to take the whole testimony and charge, the jury could not have been impressed other than that the charge referred to what occurred within this short period, and that it embraced the whole of it.

Again, appellant complains of said manslaughter charge by the court, because it requires that the provocation must have occurred at the time of the homicide, and cites in support of this contention Akin v. State, 56 Texas Crim. Rep., 324; Tucker v. State, 50 S. W. Rep., 711.  By this it is seen that appellant contends that the first subdivision of said article 1129 specifically defining what is meant in the definition of manslaughter in article 1128, Penal Code, by the expression, "under the immediate influence of sudden passion" is, in effect, not the law.  We say of this, what we said of the use of the word "sudden" above complained of, that where the statute so specifically enacts, instead of following such decisions if they be otherwise, we will abide by the specific and direct enactment of the Legislature.  This is just as much made a part of the definition, and what it takes to constitute manslaughter, as any other part of the statute, and even though there may be some loose or general expressions of this court in rendering decisions, indicating that this clause of the statute ought not to be given, in passing on charges, if such charge complies with the statute, we will follow the statute instead of such decisions.  Besides this, the facts of this particular case make it not

only appropriate, but actually necessary, that this particular provision of the statute should have been given. The testimony of Mrs. Jaynes, in behalf of appellant on direct examination, shows that prior to this killing and in no way connected with the claimed enticing away of appellant's daughter, Amelia, just the week before the killing that deceased was always passing by their residence and looking in their house, and looking back, and always motioning in the house as he would pass by and look in. His mannerism with reference to this was different from other people as they passed by. The appellant himself on this subject-testified that prior to this killing and prior to the time that he claimed his daughter was enticed from home he had seen the deceased do things that were improper and unusual; that deceased would pass his place all the time and peer in, and at times after he got by would throw up his little finger, turn around and look in at different times; that he did not know what he meant by it then, and that late one evening about dark prior to his daughter leaving home, he went out in the alley back of his house and found the deceased standing out there and when the deceased saw him he hurriedly slipped off up the alley; that he last saw the deceased about ten days or two weeks before the killing pass by his house on the sidewalk and peer into his house, throw up his little finger as stated above, and that in the spring of 1909, when he saw him do this (the killing having occurred January 1, 1910), he caught him staring in his house and throwing up his finger, said to him: "Mr. Barron, if there is anything in here that belongs to you, I wish you would come in here and get it out," and deceased replied, "You low-down coward, I will fix you." He further testified that he knew deceased had no good feelings towards him, or he thought so from these actions; that they did not speak to each other; that deceased never spoke to him and he never spoke to deceased. From all this we conclude, and the jury therefrom could conclude, that the appellant regarded the said conduct and acts of deceased as insulting and must, long before the week his daughter left his home, have aroused appellant to anger against deceased, notwithstanding he testified that what deceased so did and said, did not make him mad, and that he had nothing against deceased. So that from this testimony, as stated above, we think it not only proper, but necessary that the court should have given the first subdivision of said article 1129, Penal Code, in the language of the statute. But however that may be, as we have said of the use of the word "sudden" above, so we say of this, that under the circumstances and testimony in this case, the jury could not have been, and were not misled from taking into consideration from appellant's standpoint, and his and his wife's and son's testimony, that the provocation which caused him to then kill the deceased, if the jury believed them, did not arise at the time of the commission of the offense, the testimony clearly showing that all of this provocation, as to what had been told him about deceased enticing his daughter from

home, and keeping her away, as claimed by appellant, arose within less than about an hour only, before the killing.

Appellant next complains of the manslaughter charge of the court, because, he says, the same does not give a clear, distinct and affirmative instruction on manslaughter based on the provocation at the time of the killing and upon the fresh insult at the immediate time of the killing. We can not agree with appellant's contention on this point. Let us see what, from the record, this claimed new provocation was. From appellant's standpoint and his testimony he claims that upon his hailing the deceased as he was passing along the sidewalk in front of his residence (wherein he had placed his double-barrel shotgun, loaded with buckshot, so that he could and did immediately seize it, fire and kill the deceased), he said to deceased, "I understand you have my little girl where I will never see her again; you must tell me where she is," and that the deceased stopped, turned and faced him and replied, "What in the hell are you going to do about it?" As we understand, this was no insulting words or conduct by deceased towards appellant's daughter, Amelia, but, if anything, it was a verbal insult to the appellant at the time, and from appellant's statement and standpoint it was unaccompanied by any such violence as contemplated by the law towards his person at the time. Article 1131, Penal Code, says: "Insulting words unaccompanied by violence is not an adequate cause." So that, even if he said what appellant claims he said, it was a mere insult to the appellant himself and was not insulting words or conduct towards his daughter Amelia. It can not be made the basis for manslaughter as adequate cause on that ground was entirely wanting. Besides the charge of the court on the subject quoted above, in general, if not specific, language, embraced this insult if it was an insult towards his daughter. It seems to us that without question and without repeating, that the charge embraced specifically everything that appellant claims was said or done by deceased, not only at the immediate time of the killing, but for a week prior thereto (the time his daughter Amelia left his home), and that it embraced every feature of the insulting words or conduct by deceased concerning Amelia that was claimed to have been communicated to appellant and which by express statement or implication could have been construed by him as any insulting words or conduct towards her that could be properly embraced, shown by the appellant's testimony, by himself and the other witnesses.

Appellant complains again, that the court erred in said manslaughter charge wherein he at one time therein used the word "honestly," preceding "believed." The charge above quoted does show that the court in one place used this word "honestly." It may have been improper, but if so, it was not used by the court in that clause of the charge wherein the question was submitted to the jury for its finding on that subject. And besides, if error, it was clearly invited by appellant, for in one of his special charges requested on that subject

and in that connection he used exactly the same word in the same connection, and if the court followed him therein, he certainly can not complain, even if it was a minor error in this way committed.

Appellant again complains of the charge, in effect, that it did not separately and distinctly submit adequate cause arising from the claimed hostile demonstrations of what the appellant testified the deceased did immediately at the time of the killing in putting his hand up to or into his bosom for the purpose, and as he believed, with the intention of immediately producing therefrom a pistol and shooting appellant therewith. We think the testimony in this case raises no such issue that should have been submitted separately to the jury, if it was raised at all. His wife and son, by their testimony, show and claim that his passions were aroused because of the communication to him of his married daughter within about an hour before the killing, and he in no way properly, by his testimony, shows that at that time any other or further passion whatever was aroused, other than by seeing deceased as he was the first time passing his house, but, on the contrary, he bases his claim of self-defense on that claimed demonstration.

The only other objection to the charge on manslaughter necessary to notice is appellant's claim that in submitting to the jury for its finding the question of manslaughter, the court used these words: "Not in defense of himself against an unlawful attack producing a reasonable expectation or fear of death or serious bodily injury." This in the connection in which the court uses it could not and did not mislead the jury, for the effect of it was that they must not find the appellant guilty of manslaughter if his claim of self-defense would prevent. The charge on self-defense was subsequently submitted in an entirely separate paragraph. It is elementary that the whole of a charge must be taken together and that no separate sentence or paragraph in some other portion of a charge, even though not full and complete, is reversible error.

Appellant also complains of the charge of the court on self-defense. The charge is as follows: "A reasonable apprehension of death or great bodily harm will excuse a party in using all necessary force to protect his life or person, and it is not necessary that there should be actual danger, provided he acted upon a reasonable apprehension of danger as it appeared to him from his standpoint at the time, and in such case the party acting under such real or apparent danger is in no event bound to retreat in order to avoid the necessity of killing his assailant.

"If from the evidence you believe the defendant killed the said Earl Barron, but further believe that at the time of so doing the deceased had made or was making an attack on him which, from the manner and character of it, caused him to have a reasonable expectation or fear of death or serious bodily injury, and that acting under such reasonable expectation or fear, the defendant killed the deceased,

then you should acquit him; and if the deceased was armed at the time he was killed or the defendant honestly believed he was armed and was making or attempting to make such an attack on defendant, or the weapon the defendant honestly believed he was about to use (if any) and the manner of its use (if any) were such as were reasonably calculated to produce death or serious bodily harm, then the law presumes the deceased intended to murder or aimed to inflict serious bodily injury upon the defendant."

The appellant's objections to this charge, as we understand them, are that by it the jury were required to find that there was actual danger before they would acquit appellant on self-defense and that it required them to find that the deceased had made or was making an attack, when he claims there was evidence of neither, and that this was intensified by that part of the charge which stated that if deceased was armed, or defendant believed he was, and that the weapon defendant believed he was about to use, if any, and the manner of its use, if any, was such as was reasonably calculated to produce death or serious bodily harm, that the law presumed the deceased so intended; and also that by said charge the jury were required to believe the truth of the defense's theory of self-defense, whereas if they believe it or had a reasonable doubt of its truth, he was entitled to an acquittal and the court should have charged reasonable doubt in connection with the charge on self-defense. In his brief he makes other complaints of various words and phrases in this charge, but he did not make them in the court below; hence, we will not consider them here.

The appellant made no objection to this charge at the time it was given. Neither did he ask any special charge on the subject at all. The first objection he makes thereto is after the verdict of the jury in the motion for new trial. Article 723, Code Criminal Procedure, as amended by the Act of 1897, has all the time, by this court, been held to be a remedial statute. And while it expressly provides that objections to a charge may be made in the motion for new trial, this court has at no time looked with so much favor upon objections to a charge when first presented in the motion for new trial that it has when exceptions were made at the time the charge was given, or special charges were requested to correct such defects, or any omission in a charge. The object and purpose of this is that the lower court may have the benefit of such matters before the verdict of the jury. So that if his attention is thereby directed to any defect, or omission he may correct it and give to the jury a correct charge. It is not only to the interest of the appellant and his attorney to thus protect his rights, but it is his duty to do so, and while we do not intimate that objections for the first time made in the motion for new trial will not be considered, we must necessarily be influenced by such matters in considering objections first made after the verdict, because said article 723 prohibits this court from reversing a case because of an error of

either commission or omission in the charge of the court "unless the error appearing from the record was calculated to injure the rights of the defendant," and taking the charge as a whole and considering the whole case, these objections do not constitute reversible error.

What is an "attack" or "making an attack" in contradistinction to "about" to make an attack or making a demonstration is, in most cases, shadowy and on the border line. The testimony in this case, we think, without question shows that the appellant knew the deceased would pass along the sidewalk in front of his house about, or just before, 1 o'clock. He had prepared his double-barrel shotgun loaded with buckshot and set it just inside of his door, he standing on the outside of it when he knew the deceased was going to pass. He claims to have hailed the deceased and said to him, "I understand you have my little girl where I will never see her again, and you must tell me where she is." That deceased stopped, turned and faced him and replied, "What in the hell are you going to do about it?" and the deceased ran his hand in his bosom, and he (appellant) lost no time in getting his gun to shoot him and did then shoot and kill him. Appellant's wife testified that at this time deceased put his hand in his bosom like he was going to pull his pistol out and her husband got his gun and fired quickly. His son on that point testified that the deceased ran his hand in his bosom, turned and stooped his shoulders and about that time he heard the gun fire.

It is unnecessary to give the testimony of the State's witnesses to the effect that no such things occurred, but that deceased was quietly walking along from his home to his work and as he got in front of appellant's house the appellant suddenly announced to him that he was going to kill him and proceeded immediately to do so, and that the deceased did not stop and turn towards appellant, and said nothing and did nothing, and had no time to do or say anything. But the question is, whether or not what the appellant and his wife and son testified deceased did about his pulling his pistol, was "making an attack" on appellant or that what he did was a mere demonstration as contradistinguished · therefrom. From appellant's standpoint he certainly did not have to wait until the deceased actually fired upon him to constitute it an attack, and we know that it only takes a moment—the twinkling of an eye—under such circumstances for an assailant in the act of drawing a pistol to do so and fire. It seems to us that under such circumstances as detailed by appellant and his wife and son, that what they claimed the deceased then did was making an attack on appellant and that the criticism of the court's charge, under the circumstances, is not a tenable one. And instead of it being against appellant it occurs to us it was in his favor for the court to charge as he did, if the deceased was armed at the time or, the defendant believed he was, and was making or attempting to make such attack on him, or the weapon appellant believed he was about to use, if any, and the manner of its use, if any, was calculated to

produce death or serious bodily harm, then the law presumed he intended to do so upon appellant. All this, it occurs to us, was presenting the matter in appellant's favor as he alone saw the things from his standpoint at the time, and from said testimony he must have believed that the deceased was then making or attempting to make, as the charge says, an attack on him with a pistol and that the manner of its attempted use was calculated to produce death or serious bodily harm. It is true that the said charge of the court did not minutely go into the details of these various matters, but we can not say that it was reversible error not to do so when what was said was applicable, and no exception was taken to the charge at the time and no special charge requested covering any of the points now complained of. Taking into consideration the whole matter, as we are required to do, we are bound by the statute which says "the judgment shall not be reversed, unless the error appearing from the record was calculated to injure the rights of the defendant," and viewing it as we do, the said errors, if any, were not calculated to injure the rights of the appellant.

None of the complaints made by appellant to the argument of the district attorney present any reversible error, for, taking the bills as a whole, they show that what the appellant objected to was brought about and induced by his own argument to the jury which the district attorney was answering, and the district attorney clearly had the right to discuss the weight of the testimony and the credibility of the witnesses before the jury.

The only other question presented is shown by appellant's bills of exception to the testimony of the witnesses Ada King, Terrell Bates and Burrell Ohler.

It is clearly shown in this case that the appellant's theory, from the claimed communications of his married daughter and his wife to him within an hour before the killing, was that the deceased had enticed his daughter Amelia from his home for immoral purposes and he introduced witnesses tending to show this, one of whom testified that he had seen the deceased out in the woods with Amelia about night of one of the nights during the week she was away from home. This witness, if believed, would have shown or tended to show that the deceased had her at that time and place for immoral purposes. Another witness for him testified that during the same week he had seen deceased with this girl Amelia in the city of Houston coming out of one of the restaurants with her and that he, at that time, took her into a rooming-house, which was unquestionably an attempt to prove that the deceased took her up into this house on this occasion for immoral purposes. The State had the right in rebuttal of this, as the court held and the bill shows, to counteract this testimony. In order to do so it was entirely proper for the State to show the occasion for Amelia leaving her parents' home and with whom and where she was continuously from the time she left her father's house until

after the killing, and that at none of these times was the deceased with her or had any opportunity of being with her anywhere. If in making this proof by implication, the testimony of the witnesses objected to showed that she was with other men in various rooming-houses and out in the woods on one occasion with a man—not the deceased—and that all of this showed that during the whole of the time from time to time, both in the daytime and at night, during her absence, she was having sexual intercourse with other men, certainly it would not make such testimony inadmissible. In our opinion the court correctly admitted all this testimony objected to and that none of appellant's objections thereto should have been sustained.

There are no other questions necessary to be discussed. From the whole record, in our opinion, no reversible error is shown, so that the judgment will be affirmed.

*Affirmed.*

DAVIDSON, PRESIDING JUDGE (dissenting).—I can not agree with my brethren in the opinion as it relates to the issues of self-defense and manslaughter, nor can I agree with the expressed views contained in the opinion in regard to article 723, White's Code Criminal Procedure. This decision is not in accord with the statutes as heretofore construed, and is out of harmony with the opinions heretofore rendered on those questions. This opinion and that on rehearing overrule practically all cases on the questions involved in the issue of manslaughter. The reporter will give a brief statement of propositions and authorities contained in appellant's brief and rehearing motions and arguments.

HARPER, JUDGE (partly concurring).—I concur in the opinion affirming this case, but not in all the expressions used in this opinion, and the one overruling the motion for rehearing. In this case, appellant was, as he alleges, informed of the insulting conduct towards his female relative on the same day, and but a short time before the difficulty, consequently that part of the charge on manslaughter that the "provocation must arise at the time to cause the passion" could not be hurtful nor harmful in this case, while under another state of facts, and this is the sole defense, it might present error.

ON REHEARING.

June 26, 1912.

PRENDERGAST, JUDGE.—The appellant, by and through his able attorneys, has presented and urged with much vigor and force that the court in the original opinion herein erred in not sustaining his contentions against the charge of the court on manslaughter. His brief and argument in support of the motion is very lengthy and he cites and quotes from many decisions of this court. We have carefully reconsidered the case, the appellant's brief and argument and the cases

cited by him. There has been nothing presented to cause us to change our views as expressed in the original opinion, and we adhere thereto.

In passing on the charge of the court in any case the whole of it must be considered, and it must also be considered in connection with the testimony.

It is also essential to know what the facts were, and what the court had under consideration and discussion, in determining the application of a previous decision of the court cited to sustain a given proposition. The general principles of law, and the statutory provisions, do not change; or rather, are not changed in the decision of any case, but the application of those principles and of the statutes to the subject under investigation may be applicable in one case, and wholly inapplicable in another. This must always be kept in mind, when a case is cited as authority.

When we consider these principles and rules, it is our opinion that many of the cases and excerpts therefrom cited and quoted by appellant in his brief and argument, have no application to this case. We deem it unnecessary to take up and distinguish them at this time.

Appellant lays particular stress against the original opinion herein, in sustaining the charge of the lower court wherein the court quoted the very definition of manslaughter in article 1128, Penal Code, that "manslaughter is voluntary homicide committed under the immediate influence of *sudden* passion;" and again, wherein the charge quoted article 1129, Penal Code, of the very statutory definition of what is meant by, "under the immediate influence of sudden passion," this provision, "that the provocation must arise at the time of the commission of the offense, and that the passion is not the result of a former provocation." And he contends that as these articles of the Code were originally enacted in 1856, the amendment thereto in 1858, by adding what is now article 1133, as follows: "When it is sought to reduce the homicide to the grade of manslaughter, by reason of the existence of the circumstances specified in the fourth subdivision of article 1132 of the Penal Code, it must appear that the killing took place immediately upon the happening of the insulting conduct, or the uttering of the insulting words, or so soon thereafter as the party killing may meet with the party killed, after having been informed of such insults," modified, or in effect, repealed the *"sudden"* passion in article 1128, and also that, "provocation must arise at the time of the commission of the offense" in 1129, when applied to a killing caused by insulting conduct or words, etc. The fourth subdivision of article 1132, above referred to, is in that part of the manslaughter statute which defines what are adequate causes as follows: "Insulting words or conduct of the person killed towards a female relation of the party guilty of the homicide." We believe there is nothing in this contention by appellant. All the articles of the Code as they now exist on the subject of manslaughter and as now ar-

ranged have been enacted and reenacted time and time again by the Legislatures of Texas. If it had been the intention of the Legislature, as contended by appellant, to do away with *"sudden* passion" as one of the necessary elements of manslaughter when the killing is claimed to have occurred, because of insulting words or conduct of the person killed towards the female relation of the party killing, the Legislature in some of these revisions of the Code, or in some independent Act would have specifically and clearly said so and enacted. Besides, when we take into consideration the whole of the specific language used in article 1133, to the effect that when it is sought to reduce a homicide to manslaughter because of insulting words or conduct towards a female relative, "it must appear that the killing took place *immediately* upon the happening of the insulting conduct, or the uttering of the insulting words, or *so soon* thereafter as the party killing may meet with the party killed after having been informed of such insults," and especially the whole manslaughter statute, it repels the idea that the slayer can nurse his wrath from year to year, or month to month, or week to week, or even day to day, and then claim that because he did not meet the insulting party until after the lapse of these years, or months, or weeks, or even days, and then killed him, he is guilty of manslaughter only. Even if the killing occurred on the first meeting, this meeting can not be put off for years, or months, or weeks, or even days and he then kill the insulter and be guilty of only manslaughter. The statute and the Legislature enacting it never intended that any such construction should be put on this language. On the contrary, to take the whole context and all the language, and the full statute, it clearly means that the killing must take place within some reasonably *short* time or *immediately* after the insulting words or conduct are communicated to the slayer, and not that the slayer shall wait for days, or weeks, or months, or years to wreak his vengeance.

"The *statute* lays the limitation as to time, and *we* can not legislate. While public policy recognizes, on the one hand, the fraility of human temper, it also demands that the exceptions to the law of 'life for life' should be limited and closely scrutinized.

"The law recognizes the uncontrollable power of *sudden* passion as the cause of homicide, when this *sudden* passion arises upon a provocation which would commonly or naturally arouse the passion or sudden resentment of a person of ordinary temper to such a degree as to render the mind incapable of cool reflection. It is to be observed that this passion is *sudden, uncontrollable* and *flaming* up from the injury or insult, and the homicide *must occur before there is reflection or composure.* Our code defines and describes the character of the passion that reduces homicide to manslaughter as '*sudden* passion.' No time is allowed, except in the cases mentioned in article 1132, for brooding over the wrong, or for compassing and preparation;

for then the homicide becomes deliberate, premeditated and malicious, though the provoking cause be an adequate cause.

"But the code has, in cases . . . of insulting words and conduct to female relatives, extended the time in which homicide, when committed, may still be manslaughter. In such cases the law requires the homicide to occur as soon as . . . the party killing may meet the one giving the insult, after being informed thereof. If not done at such time, the injury may become evidence of malice and preparation to kill; evidence of premeditation and deliberation." . . . And we say that the time even of this first meeting can not be put off for years, or months, or weeks, or under some circumstances, for even days.

"The law made a further concession to human frailty when it divided murder into two degrees. . . . Under our code, a homicide committed in *sudden* passion, upon an *in*adequate cause, is murder in the second degree. . . . But it is to be observed it must be the *passion that strikes;* for if the slayer broods over his injury (or insult) and deliberately forms the design to kill, and prepares for it, the presence of passion at the moment of the premeditated homicide can not change its nature. The law makes no allowance for the *passion of revenge.* While it concedes something to the instinctive, unreasoning *passion, that blindly strikes,* it has no sympathy with the vindictive, calculating spirit that deliberately premeditates and maliciously acts." (Italics ours.) Ex parte Jones, 31 Texas Crim. Rep., 422.

In the event the slayer does not meet the insulting party for years, or months, or weeks, or even perhaps days, afterwards, in the meantime nursing his wrath and adding flame to his passion, such conduct and considerable length of time would become most cogent evidence of malice, and it would not be the *passion suddenly aroused which strikes and kills,* but it would be the *passion of revenge,* in which event the killing would not be manslaughter, but, at the very least, murder in the second degree. Miller v. State, 31 Texas Crim. Rep., 609; Massie v. State, 30 Texas Crim. App., 64.

What we have just said above indicates what our opinion is in a case where the killing did not occur until a long time after the slayer was informed of the insulting conduct or words, even though such long deferred meeting may have been the first time after the insulting words or conduct, were communicated.

However, this does not apply in this case, because, as shown in the original opinion herein, appellant acted within such a short period after being informed of the claimed insulting conduct, as to show that if the adequate cause was what aroused his passion it was within so short a time after he heard it as to make such passion *sudden,* and if the provocation was what aroused his sudden passion and caused his conduct, it was within the reasonable time, or at the time, of the commission of the offense. It will be borne in mind that the

court fully and accurately, in connection with this provocation and sudden passion, told the jury specifically to consider in connection therewith all the facts and circumstances in evidence in the case.

We deem it unnecessary to further discuss this or any other question raised by appellant in his motion for rehearing because they were fully and sufficiently discussed and decided in the original opinion.

The motion will be overruled.

*Overruled.*

Davidson, Presiding Judge, dissents.